MOLINE PLOW CO. OF KANSAS CITY. MO., et al. v. CARSON.

(Circuit Court of Appeals, Eighth Circuit. December 30, 1895.)

No. 671.

1. PRACTICE ON APPEAL—REVIEW OF REPORT OF SPECIAL MASTER.
    The findings of fact and conclusions of law contained in the confirmed report of a special master appointed by consent of the parties to the suit to report the facts and the law, are conclusive. unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence.

2. MISREPRESENTATIONS BY VENDOR—LIABILITIES.
    A vendor who makes a false statement regarding a fact material to the sale, either with knowledge of its falsity or in ignorance of its falsity, when from his special means of information he ought to have known it, and thereby induces his vendee to purchase to his damage, is liable in an action at law for the damage the purchaser sustains through the misrepresentation, or to have the sale rescinded in a suit in equity, at the option of the purchaser.

3. CONTRACTS—MISREPRESENTATION.
    Plaintiff brought suit against defendant for the specific performance of a contract to sell to plaintiff certain property for sundry bills receivable and one-third of the stock of a corporation. Defendant's answer alleged that the contract was obtained by plaintiff's misrepresentations. A special master, to whom the case was referred, found, among other things, upon sufficient evidence, that plaintiff had informed defendant, during the negotiations for the contract, that one K., who was known to defendant to be a shrewd and successful man of large means, had offered to buy the stock offered to defendant, and of the value of which defendant had no personal knowledge, at a premium of 15 per cent., but that plaintiff had refused the offer, whereas in truth K. had made such an offer, but, upon investigation of the affairs of the corporation, had withdrawn it, on the ground that he was dissatisfied with the corporation's condition. *Held,* that this misrepresentation alone was sufficient to avoid the contract between plaintiff and defendant.

Appeal from the Circuit Court of the United States for the District of Nebraska.

On June 2, 1892, the appellee, Amaziah L. Carson, made a contract with the appellant the Moline Plow Company of Kansas City, Mo., a corporation, by which he resigned his position as a director, manager, secretary, and treasurer of that corporation, and agreed to sell and transfer to it within 10 days 50 shares of the capital stock of the appellant the Moline Plow Company of Moline, Ill., another corporation; and the Moline Plow Company of Kansas City, Mo., agreed to sell and transfer to him $17,500 in interest-bearing bills payable of the Moline, Milburn & Stoddard Company, a corporation, and one-third of the capital stock of that company, the par value of which was $33,333.33, and to pay him $125 in cash. Carson refused to carry out this contract, and on July 7, 1892, the appellants exhibited their bill in the court below for a specific performance of it. On September 3, 1892, Carson answered this bill, and, among other defenses, he pleaded that he was induced to make the contract by the fraudulent misrepresentations of the officers and directors of the Kansas City company relative to the value of the various assets of the Moline, Milburn & Stoddard Company, relative to the value of the one-third of its capital stock which he had agreed to buy, and relative to the refusal of the Illinois company to accept an offer of one Kingman to purchase the same at a premium of 15 per cent. above its par value a short time before the contract was made. On October 12, 1892, the appellee filed his cross bill in this case, and prayed for a rescission and cancellation of the contract on account of the fraudulent misrepresentations of the Moline Plow Company of Kansas City, referred to in his answer. The appellants answered this cross bill, and denied these charges of fraud, and the suit proceeded to final hearing and decree. On December 30, 1893, by consent of the parties, the case was by order of the court referred to W. W. Morsman, Esq., to report the law and the facts therein. He reported, among other things, that the contract was obtained by the practice of gross frauds upon Carson, by which he was circumvented and lured into giving an assent to it, which would not have been given if the dealing had been fair and honest on the part of the officers of the appellants; that on account of this fraud the appellants were not entitled to a specific performance of the contract, and that the appellee was entitled to a decree for its rescission. The court below confirmed this report, and rendered a decree in accordance therewith. This is the decree which the appeal brings before this court for review.

John L. Webster, for appellants.
James H. McIntosh, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The special master, upon whose report the decree in this suit is based, was appointed by consent of the parties, not to hear and report the evidence, but to report the facts and the law in this case. The parties to this suit selected him, and made him a special tribunal to hear and decide this suit. His report has been confirmed by the court below, and it carries with it similar presumptions to those which accompany the special verdict of a jury or the special findings of a court in an action at law or its decree in a suit in equity. The settled rule of the national courts is this: The findings of fact and conclusions of law contained in the confirmed report of a special master appointed by consent of the parties to the suit to report the facts and the law are conclusive, unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence. It relieves the appellate court from the duty of weighing testimony or

considering the credibility of the witnesses where there is a substantial conflict in the evidence. Kimberly v. Arms, 129 U. S. 512, 525, 9 Sup. Ct. 355; Crawford v. Neal, 144 U. S. 585, 596, 12 Sup. Ct. 759; Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821; Davis v. Schwartz, 155 U. S. 631, 637, 15 Sup. Ct. 237.

The report of the master covers 24 closely-printed pages of this record. It contains a concise and positive finding upon every issue of fact presented by the pleadings or the evidence, and a decision of every question of law which arose in the case. The findings of fact are set forth in natural and logical order, and are followed by the legal conclusions which he deduces therefrom. A more complete and finished report is not to be found among the records of this court. The evidence from which the master deduced his findings and conclusions covers more than 700 pages of the printed book before us, and, after a careful examination of the entire record of the case, we despair of stating the facts and the law applicable to them more concisely than he has done. In view of the rule to which we have adverted, any extended statement of them would be useless. Suffice it to say that many of the issues in the case which were strenuously contested at the hearing, and upon which the master was compelled to find the facts and the law, are immaterial in this court, and need no consideration, in view of the conclusion that has been forced upon us upon the main issue in the case. It goes without saying that if the appellee, Carson, was induced to make this contract by the actionable fraud of the appellant the Moline Plow Company of Kansas City, its performance ought not to be enforced, the decree which rescinded it was right, and it is immaterial who made the first default in its performance, or when, how, or why it was made. The master found that Carson was induced to assent to the contract by gross frauds which were practiced upon him by the officers of the Kansas City company. But he did not find that fact in these terms. He found and set forth in his report the existence of various facts and circumstances which were in issue at the hearing, and which, when considered together, led his mind to this ultimate conclusion. They are too numerous and complicated for repetition here. A few of the most salient of them were these:

Carson was, and had been for some time, the manager of the Kansas City Company under a contract with it for a term of years. His office was at Kansas City, in the state of Missouri, and he had no knowledge of the actual financial condition of the Moline, Milburn & Stoddard Company, the principal office of which was at Omaha, in the state of Nebraska. The capital stock and the management of the Kansas City company were controlled by the Moline Plow Company of Illinois, and the officers of the latter company either were, or controlled, the officers of the former. The Moline Plow Company of Illinois owned one-third of the capital stock of the Moline, Milburn & Stoddard Company, the par value of which was $33,-333.33. The officers of this Illinois company had been notified that $60,000 of the bills receivable of the Moline, Milburn & Stoddard Company were worthless, and that its management had been bad

and unbusinesslike, and they had notified the owners of the other two-thirds of the stock of that company of these facts. None of these bad bills receivable had been charged off from the list of assets of the Moline, Milburn & Stoddard Company. Immediately after receipt of notice of these facts, the owners of the other two-thirds of the stock of this company sold it to one Kingman at 15 per cent. premium upon its par value. The Illinois company sent its treasurer to Omaha to investigate the financial condition of the Moline, Milburn & Stoddard Company, and after a careful investigation he made a report which purported to be a detailed statement of the assets and liabilities of that company as they existed on March 1, 1892, and which set forth the amount and value of its real estate, its bills receivable, and its other property. If this statement had been true, the stock of the Moline, Milburn & Stoddard Company would have been worth about its par value, but it was in fact worthless. In April, 1892, Kingman offered to purchase of the Illinois company its one-third of the stock of the Moline, Milburn & Stoddard Company, which was afterwards sold to Carson, and to pay it 15 per cent. premium on its par value; but no answer was made to this offer, and five days later Kingman withdrew it, and notified the Illinois company that on looking over the business of the Moline, Milburn & Stoddard Company at Omaha he had found a number of things which he did not fully understand when he made his offer; that the amount of the bills and accounts receivable past due there, and of the goods in the country, was much larger than he was aware of; and that he desired to make a careful investigation of all these matters before he made a further offer. Kingman was a man of large means, of extensive acquaintance, and of long and successful business experience, with whom Carson was well acquainted. The stock which Carson owned in the Moline Plow Company of Illinois was worth about $50,000 when this contract was made, while the stock of the Moline, Milburn & Stoddard Company, for which, and $17,500 of its bills receivable, he agreed to trade it, was in fact worth little or nothing. In this situation of affairs, five of the officers of the two Moline Plow Companies, including among them the president and the treasurer of the Illinois company and the president of the Kansas City company, went to Kansas City and made the contract in question with the appellee, Carson. To induce him to sign it, they told him that Kingman had bought two-thirds of the stock of the Moline, Milburn & Stoddard Company and had paid for it 15 per cent. premium upon its par value; that he had offered the Illinois company that price for the third of its stock which it held, and that the offer had been refused, when the fact was that it had not been refused, but had been withdrawn. They concealed from him the fact that as soon as Kingman had entered upon the investigation of the affairs of the Moline, Milburn & Stoddard Company at Omaha he had withdrawn this offer because the amount of its past-due accounts and bills receivable and of its goods in the country was so much larger than he supposed it was when he made it. They presented to him the detailed statement of the assets and liabilities of the company which the treasurer of the Illinois company had made in his report, from which the capital stock

appeared to be worth about its par value, and told him that $15,000 should be added to the value of the assets there stated on account of the earnings of the company after March 1, 1892, and that the stock was worth 15 per cent. premium upon its par value. After listening to these and other statements, and in reliance upon them, Carson executed the contract.

After finding the existence of the facts to which we have referred, and many minor facts and circumstances which tend to support his conclusion, the master found as a conclusion of law that:

"The contract was obtained by the practice of gross frauds upon Carson, by which he was circumvented and lured into giving an assent that would not have been given if the dealing had been fair and honest on the part of the officers of the complainants."

A careful examination of the record discloses the fact that while upon many issues the testimony was conflicting, there was ample evidence to support the findings of the existence of the salient facts which we have recited. Some of them, indeed, rest upon uncontradicted evidence; notably the deceitful and misleading statement that the Illinois company had been offered 15 per cent. premium for its stock by Kingman, and that that company had refused to accept the offer. That misrepresentation alone was enough to avoid this contract. Here was the appellee, engaged in the discharge of his duties at Kansas City, ignorant of the financial condition of the Moline, Milburn & Stoddard Company, and ignorant of the value of its stock. He knew Kingman, and knew him to be a shrewd, careful, and successful business man. He knew that he had bought, and had paid 15 per cent. premium for two-thirds of the stock of this company. He was told that he had offered the same price for the third of the stock under consideration, and that the owner had rejected that offer. The fact was that, as soon as Kingman had obtained control of the company, and had commenced to investigate its affairs at Omaha, he found that he had been cheated in his purchase, and had notified the Moline company that he withdrew his offer, because the company had so large an amount of past-due paper and accounts, and so many goods in the country. Suppose that these officers had told Carson the whole truth about this offer and its withdrawal, would he have closed this trade? He reasoned that the shrewdness and sagacity of Kingman had convinced him that this stock was worth 15 per cent. premium, and that it must be safe for him to buy it at that price. Suppose that he had known that Kingman had instituted an investigation after his purchase, and had discovered that it was not worth that price, and had decided that he would give nothing and make no offer for the third of the stock held by the Illinois company until he had completed the examination upon which he had entered, which would end in developing the fact that the stock was worthless, would he have made the contract then? Yet this was the truth. Would he not have reasoned that Kingman had already discovered that it was not safe to buy the stock at any price until the affairs of the company were thoroughly investigated, and that he would not do so? These questions answer themselves. Nothing is more deceitful than half

the truth. This and many other like misrepresentations made by the officers of the appellants were not mere exaggerations of the value of the stock or of the assets of this corporation. They were fraudulent misrepresentations of material facts that were actually within their knowledge, or that the appellee had a right to presume, from their relation to the corporation, were within their knowledge. They constituted fraud, resulted in damage, and warranted the legal conclusion which the master reached.

A vendor who makes a false statement regarding a fact material to the sale, either with knowledge of its falsity or in ignorance of its falsity, when from his special means of information he ought to have known it, and thereby induces his vendee to purchase to his damage, is liable in an action at law for the damage the purchaser sustains through the misrepresentation, or to have the sale rescinded in a suit in equity, at the option of the purchaser. Barnes v. Railway Co., 12 U. S. App. 1, 3, 6, 4 C. C. A. 199, 54 Fed. 87; Cooper v. Schlesinger, 111 U. S. 148, 155, 4 Sup. Ct. 360; McFerran v. Taylor, 3 Cranch, 270; Doggett v. Emerson, 3 Story, 700, 732, 733, Fed. Cas. No. 3,960; Kiefer v. Rogers, 19 Minn. 32, 36 (Gil. 14); Litchfield v. Hutchinson, 117 Mass. 195, 197; Cole v. Cassidy, 138 Mass. 437, 438.

Enough has been said to show that the master committed no error in the application of the law, and no mistake in the consideration of the evidence upon this issue of fraud, that could result in a reversal of his findings upon this issue. This concludes the discussion. The decree below must be affirmed, with costs, and it is so ordered.