MERCANTILE TRUST CO. v. FARMERS' LOAN & TRUST CO. et al.[1]

(Circuit Court of Appeals, Eighth Circuit. May 24, 1897.)

No. 800.

**1. RAILROAD RECEIVERS—ADOPTION OF LEASES.**
Receivers of a mortgaged railroad have the option to assume or to renounce within a reasonable time the leases of branch railroads which they find in the possession of the mortgagor, and are directed to operate.

**2. SAME—LIABILITY FOR DEFICITS.**
The expenses and deficits incurred by the receivers of an insolvent corporation, in lawfully operating another railroad which has been operated by the insolvent corporation under a lease which it was the duty of the receivers to renounce, are chargeable to the leased railroad, and not to the railroad of the lessee, where the receivers have not assumed the lease.

**8. SAME—EXPENSES—PREFERENTIAL CLAIMS.**
The moneys expended and the liabilities incurred by the receivers or trustees in the management of property intrusted to them constitute preferential claims upon the trust estate, which must be paid out of its proceeds before they can be distributed to the beneficiaries.

**4. SAME—DISCRETION OF COURT—APPEAL.**
When the question of the renunciation or adoption by the receiver of a railroad of the leases of branch lines has been submitted to the court which appointed the receiver, and, after full investigation by a master and the submission to him of conflicting evidence bearing upon the question, has been decided by such court, its decision, being upon a question of business policy and not of law, and administrative rather than judicial in its nature, should not be disturbed by an appellate court, unless it appears that the discretion of the lower court was abused.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Edward C. Henderson, for appellant.

John W. Noble and George Zabriskie (George H. Shields was with them on the brief), for appellees.

Before SANBORN and THAYER, District Judges.

[1] Rehearing pending.

SANBORN, Circuit Judge.    This is an appeal from an order denying the petition of the receivers of the St. Louis & San Francisco Railway Company for leave to renounce the leases of four railroads, which had been taken by that company before the receivership, and directing them to pay the rent reserved by these leases during the receivership from the income or the proceeds of the property of the lessee company before applying any of them to the payment of the bonds secured by its consolidated mortgage.    71 Fed. 601.    It was upon the consolidated mortgage that the foreclosure proceedings in which these receivers were appointed was based.    That mortgage was subsequent in date to the four leases, and these leases secured bonds which were issued under first mortgages upon their respective lines, which were made simultaneously with the leases.    The history of these transactions was this:

In 1886 and 1887 the corporations which owned these leased railroads demised them to the San Francisco Company for long terms of years, and at the same time delivered to that company a large majority of their stock, so as to give it complete control of their corporations and their property.    Each of these lessors, at the time it made its lease, made a mortgage upon its railroad to secure bonds which it issued, and by the terms of the lease appropriated to the bondholders a sufficient amount of the rent reserved to pay the interest on the bonds as it matured.    The San Francisco Company covenanted, in each of these leases, to pay the taxes on the leased premises, to operate the leased railroad, and to pay certain rents, which it agreed should in no event be less than the interest on the first mortgage bonds of the lessor.    The names of these leased lines, their length, and the amount of their outstanding first mortgage bonds, which were secured by these simultaneous leases, were as follows: Salem Branch, 54 miles, $810,000; Beaumont Branch, 61.86 miles, $744,000; Anthony Branch, 59.35 miles, $732,000; Midland Railroad, 107.20 miles, $1,608,000.    The annual interest upon these bonds, and hence the minimum annual rental which the San Francisco Company agreed to pay for the use of these railroads, was $193,380, in addition to the taxes upon and the expenses of operating them.    That company took possession of these railroads under these leases, and operated them until they were taken from it by the receivers in this case under the order of the court below, procured by the Mercantile Trust Company, the trustee named in the consolidated mortgage, and the appellant in this case.    The consolidated mortgage was made by the San Francisco Company on June 11, 1891, to the Mercantile Trust Company, to secure an issue of $50,000,000 of bonds, $14,357,500 of which have been issued and are outstanding.    It described and conveyed to the trust company, for this purpose, 989.23 miles of railroad owned by the San Francisco Company, all its leasehold estate in the four leased railroads, a large majority of the capital stock of the four lessor companies, and all the equipment and other property which pertained to what was known as the "Frisco System" of railroads.    It provided that the trustee should certify and deliver the aggregate amount of $36,074,500 of the bonds secured by it in exchange for the underlying

bonds of some of the railroads of its system, among which were those secured by the first mortgage bonds of these four leased lines. In this mortgage the San Francisco Company agreed to pay the taxes upon, to maintain, repair, and renew the equipment upon, and to operate, the four leased lines. The mortgage provided that, in case of a default by the mortgagor in the performance of any of its covenants, which should continue for six months, the trustee, upon the request of the holders of the greater amount of the outstanding bonds secured by it, but not otherwise, should "then have or be entitled to possession of all the railroads [that is, all the railroads covered by this mortgage, including both those owned and those leased by the San Francisco Company], and conduct the business of the railway company, and exercise the franchises pertaining thereto; and receive all the tolls, rents, income, and profits from said railroad and other property, and the interest upon all bonds and the dividends upon all shares of capital stock then held by the trustee under the provisions of this mortgage, and from such receipts shall pay all expenses of taking possession of said railroads and other property, and operating said railroads, and conducting said business, and the expenses of such repairs, replacements, alterations, additions, and improvements to the mortgaged property as the trustee shall deem needful, and all taxes due upon any of the mortgaged property, and all amounts due for interest or principal of any of the bonds or other obligations of the railway company secured by any mortgages or pledges prior in lien to this mortgage, and, after deducting such expenses and payments, and retaining a reasonable compensation for the services of the trustee in connection with the making of said entry, and taking possession of said railroads and other property, and operating the same, and conducting the said business, shall apply the net income to the payment of any interest previously due, or becoming due, during such possession, on bonds secured by this mortgage, in the order in which such interest shall have become due, ratably, to the persons entitled to such interest, and to apply any remainder of said income to the payment of the principal of said bonds, if then due, with all interest accrued and unpaid thereon, ratably, to the owners of said principal and interest, without discrimination or preference." It provided that, if default should continue for six months after the trustee had made written demand of payment or performance, it should, upon the request of the holders of the greater amount of the outstanding bonds secured by the mortgage, but not otherwise, "cause all of the railroads and other property then secured by this mortgage, including all shares of capital stock and bonds held in trust under the provisions hereof, to be sold as one property at public auction, at the city of St. Louis, in the state of Missouri," and that said sale should be made subject to all prior mortgages, liens, and pledges set forth in the consolidated mortgage.

On December 21, 1893, the Mercantile Trust Company filed its bill in the court below to foreclose the consolidated mortgage, on the ground that the San Francisco Company had made default in the payment of taxes upon the mortgaged property. It is alleged in its

bill that the railroads owned and controlled by and the four railroads leased by the San Francisco Company formed a trunk line, that this fact was one of the most important ingredients of its value, and that its severance would result in a ruinous sacrifice to every interest in the property. It prayed for the foreclosure of the mortgage, for the sale of all the mortgaged property, and for the appointment of receivers to hold and operate the mortgaged railroads during the pendency of the suit. The defendant filed an answer practically admitting the allegations of the bill, and on the same day the court appointed receivers, and directed them to take possession of and operate as one property all the railroads constituting the Frisco System, including those owned and those leased by the San Francisco Company. The trust company subsequently filed a supplemental bill founded on a default of the mortgagor in the payment of the interest due in April, 1894, and that bill was ordered to be taken pro confesso as against the San Francisco Company on April 4, 1895. On December 8, 1894, pursuant to prior orders extending their time to do so, the receivers filed a petition in this foreclosure suit for permission to renounce the leases on the four branch roads, on the ground that none of them earned an amount sufficient to pay its operating expenses, the taxes upon it, and the current rent reserved in its lease. The petition was referred to a master, to hear, determine, and report "whether it was to the advantage of the trust confided to the receivers that the leases should be disaffirmed." The master gave notice of this hearing to the lessor companies, and to the trustee of every mortgage upon any part of the Frisco System. The trustees of the first mortgages upon the four leased lines and the trustee of the consolidated mortgage appeared before the master, and were heard. The amounts of the annual taxes upon the branch railroads, the expenses of operating them, their respective earnings for different periods, and the earnings and expenses of operating the entire system, were proved. Testimony was introduced relative to the character, and the past, present, and probable future productiveness of the country through which the leased lines extend. Experts gave their opinions as to the value of the use of some of these railroads to the Frisco System, and, after considering all the evidence and arguments of counsel, the master reported that neither of the leased lines earned an amount sufficient to pay the taxes upon it, its operating expenses, and the rent reserved in its lease, but that the unity of the property covered by the consolidated mortgage constituted one of the chief elements of its value, that to permit its severance would result in a ruinous sacrifice to every interest in it, that it would bring a much larger price at the foreclosure sale if that sale carried to the purchaser the right to the leases unincumbered by any forfeiture of them, that it was to the advantage of the trust confided to the receivers that the leases should not be disaffirmed, and that the receivers ought to pay any deficiencies caused by operating the leased lines out of the income derived from the entire system. To this report the appellant excepted. The court below overruled its exceptions, confirmed the report, adjudged that the receivers were liable for the rentals reserved in the leases of the four

81 F.—17

branch lines for the time during which they had possession of them, that those rentals were a lien on all the income and all the property in their hands superior in equity to that of the consolidated mortgage, and that the receivers should pay them out of the income or out of the proceeds of the sale of the property before applying either to the payment of the debt secured by that mortgage. This is the order which is challenged by this appeal.

Many questions have been discussed in the briefs and arguments of counsel in this case, but the decision of one will dispose of them all. That question is: Ought this court to reverse the decision of the court below, that the leases of the four branch lines ought not to be renounced by the receivers? Counsel have devoted much time and space to the consideration of the question whether or not the income of the entire property covered by the consolidated mortgage was sufficient to pay its operating expenses and the rents reserved under these leases during the receivership. That question is immaterial. If the leases should have been renounced, no part of the deficiencies resulting from the operation of the leased lines can be charged against or paid out of the income or out of the proceeds of the corpus of the trust estate, but these deficiencies must all be paid by the railroads which respectively caused them. Ames v. Railway Co., 74 Fed. 335, 338, 339, 344; Ames v. Railway Co., 60 Fed. 966, 970, 971; Railroad Co. v. Humphreys, 145 U. S. 82, 96, 12 Sup. Ct. 787; Express Co. v. Railroad Co., 99 U. S. 191; Railroad Co. v. Humphreys, 145 U. S. 105, 113, 12 Sup. Ct. 795; U. S. Trust Co. v. Wabash W. Ry. Co., 150 U. S. 287, 14 Sup. Ct. 86; Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 23 Fed. 863; Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 34 Fed. 259; Farmers' L. & T. Co. v. Northern Pac. R. Co., 58 Fed. 257, 266; New York, P. & O. R. Co. v. New York, L. E. & W. R. Co., 58 Fed. 277, 280, 281. On the other hand, if the court below properly accepted and adopted the leases, the rents reserved under them became an integral part of the operating expenses of the trust estate in the hands of the receivers, as much as the wages of hired men, the rent of leased engines or cars, the traffic balances due connecting railroads, or any other ordinary expense of operation; and in this way the claims for these rents secured a preference in payment, over those of all the cestuis que trustent, out of the proceeds of the railroads, as well as out of their earnings during the receivership. The moneys expended and the liability incurred by receivers or trustees in the authorized operation, preservation, and management of the property intrusted to them constitute preferential claims upon the trust estate, which must be paid out of its proceeds before they can be distributed to the beneficiaries of the trust. Butler v. Cockrill, 36 U. S. App. 702, 20 C. C. A. 122, 130, 73 Fed. 945, 953; Ames v. Railway Co., 74 Fed. 335, 345; Mechem, Ag. § 684; 2 Jones, Liens, §§ 1175, 1177; 2 Lewin, Trusts, 639.

The only question in the case, therefore, is: Ought the finding of the court below, that it was to the advantage of the trust estate that the leases should be assumed by the receivers, and its direction that the receivers should not renounce them, to be reversed by this court?

There are two reasons why, in our opinion, this question should be answered in the negative:

1. The issue in the court below presented a question of business policy, and not a question of law. The decision and order of the court were administrative, rather than judicial. That court and its receivers were not liable for the debts nor bound by the obligations of the mortgagor when they took possession of its property. The receivers, under the direction of the court, had the option to assume or to renounce the leases of the branch roads, which they found in the possession of the mortgagor, within a reasonable time after their appointment. Ames v. Railway Co., 60 Fed. 966, 970, 971, and cases there cited. In due time, they recommended the renunciation of these leases, and asked permission to execute it; but the master, after a full hearing upon the facts and the law, recommended their assumption. The question before the master and the court was, which course would be of greater advantage to the trust estate? This was a question of business policy, upon which the minds of reasonable men might well differ. None of the parties in interest had the absolute legal right to a determination of this question in either way. The appellant, by bringing its bill in the court below, had imposed upon that court the duty of deciding which course would be of greater benefit to the trust estate confided to the receivers. It decided that the assumption of the leases would be. One who invokes the aid of a chancellor to operate railroads, and to control and conduct vast business operations, on his behalf, ought not to be permitted to reverse the administrative orders of the court for mere mistakes of business judgment. Administrative orders, which involve mere questions of business policy in the conduct of a receivership, are largely discretionary, and should not be disturbed by an appellate court, in the absence of any abuse of the discretion of the chancellor. Since there was no abuse, but the most careful and deliberate exercise, of its discretion by the court below, we think the order appealed from should not be disturbed.

2. Again, the question involved in this order was carefully considered under conflicting evidence, and decided by the master and the court below. These decisions, under the settled rule of this court, are presumptively right, and unless an obvious error has intervened in the application of the law, or some serious mistake has been made in the consideration of the evidence, the order based upon them must stand. Warren v. Burt, 12 U. S. App. 591, 7 C. C. A. 105, 58 Fed. 101; Plow Co. v. Carson, 36 U. S. App. 456, 18 C. C. A. 606, 72 Fed. 387; Trust Co. v. McClure, 24 C. C. A. 64, 78 Fed. 209; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821. The consolidated mortgage, under which the appellant obtained the appointment of the receivers in this case, provided that, if the trustee named in it ever took possession of the mortgaged property under the terms of that mortgage, it should pay all the expenses of operating all the railroads covered by it, including the leased lines, all the taxes due on any of the mortgaged property, and all the amounts due for interest or principal of any of the

bonds or other obligations of the mortgagor, secured by any mortgages or pledges prior in lien to that of the consolidated mortgage, before that net income should arise which would be applicable to the payment of the debt secured by that mortgage, and that the trustee should cause all the mortgaged railroads, and all their capital stock held under the consolidated mortgage, to be sold as one property at public auction. The fact that the trustee did not enter into the possession of the trust estate in the manner prescribed in this mortgage, but applied to the circuit court for an earlier possession and a more secure administration of the trust, cannot be permitted to avoid the effect of these provisions of the mortgage. They impressed the entire mortgaged property—the entire Frisco System of railroads—with a trust in case of default on the part of the mortgagor, for the payment, first, of the expenses of operating the entire system, including the obligations of the mortgagor for the payment of the rent on the leased lines for the benefit of the bondholders secured by the first mortgages on those lines, and, second, for the payment of the indebtedness secured by the consolidated mortgage. The trustee named in the latter could not withdraw, or relieve the mortgaged property from this trust, by declining to take possession as trustee, and imposing that duty upon the receivers appointed by the court. The property stood charged with it, whether administered in or out of the court, and every bondholder under the consolidated mortgage had notice of this trust by the express terms of his mortgage.

The terms of this mortgage alone are amply sufficient to sustain the decision and order below. The salient facts of the case all tend to the same conclusion. The first mortgages upon and the leases of the four branch lines in 1886 and 1887, the provision of the consolidated mortgage which we have quoted, the allegations of the appellant in its bill that the unity of the railroads covered by the consolidated mortgage in one system was an important ingredient of their value, and that their severance would be ruinous to every interest in them, and the fact that these leased lines have been constantly operated by the San Francisco Company under their leases, show that the shrewd and experienced men who organized the Frisco System, those who made and accepted the consolidated mortgage upon it as security for more than $14,000,000 of bonds, and the trustee under that mortgage itself, until 1894, believed that the retention and operation of these branch lines under their leases was a benefit to the railroad system covered by that mortgage, and acted upon that belief. We find nothing in the record in this case to convince us that the master or the court below made any mistake of fact or committed any error of law in coming to the same conclusion. The decree below must be affirmed, with costs; and it is so ordered.