FELTON v. CITY OF CINCINNATI et al.

(Circuit Court of Appeals, Sixth Circuit. July 5, 1899.)

No. 672.

1. LANDLORD AND TENANT — LEASE OF RAILROAD — LIABILITY OF LESSOR FOR REBUILDING.

At common law, in the absence of express covenant in a lease, the lessor is not bound to make repairs, additions, or improvements to the leased property, or to rebuild structures thereon which have become unfit for use, nor is there any implied covenant that the property is fit for the purpose for which it is leased. The fact that the demised property is a railroad does not affect the application of those principles.

**2. RAILROADS—RECEIVER FOR LESSEE—RIGHT TO CHARGE LESSOR FOR IMPROVE-MENTS.**

A receiver was appointed at the suit of creditors and stockholders for the property of a railroad company whose only interest in the road it operates was a leasehold for a term of years. The lessor was not made a party to the suit, or sought to be affected in any way thereby. *Held*, that the principles upon which courts authorize expenditures by receivers of railroads in foreclosure suits for improvements necessary to keep the road in good condition, in the interests of both the public and the parties concerned, and to charge the cost thereof as a lien on the property superior to the mortgage and other vested liens, did not authorize a court in such case to charge the cost of bridges rebuilt by the receiver under order of the court upon the lessor's interest in the property, where the lease gave the lessee no right to make such improvements at the lessor's expense.

## Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Under the authority of statutes duly enacted by the legislature of the state of Ohio, beginning in the year 1869, the city of Cincinnati constructed, and has since that time owned, a line of railway known as the Cincinnati Southern Railway, extending from the city of Cincinnati, through the state of Kentucky, to the city of Chattanooga, Tenn., a distance of 336 miles. The line of railway was built and has been controlled and managed by the city, through a board, called the "Trustees of the Cincinnati Southern Railway." The city acts and may sue, and is subject to suit, through the trustees of the Cincinnati Southern Railway. While the legislation authorizes the city to establish and own the railway, it was evidently not contemplated in the entire legislation upon the subject that the city should ever itself actually operate the line of railway, or become a common carrier. The proposition that the city should sell or lease the railway when constructed is one which runs through and is implied in all the legislation. The railroad was so far completed July 1, 1880, as to permit the passage of cars from one terminus to the other, although it was then in an uncompleted condition for practical purposes. Pursuant to specific legislative authority, the trustees, after advertising for bids or proposals for a lease of the railway, accepted a bid on behalf of the Cincinnati, New Orleans & Texas Pacific Railway Company, a corporation duly organized under the laws of Ohio, and subsequently, on October 11, 1881, the trustees, with the approval of the trustees of the sinking fund of Cincinnati, executed a lease of the railway to the company just named for a term of 25 years, the lessee agreeing to pay the lessor an annual rental beginning at the sum of $800,000, and increasing at periods of five years. Possession of the railroad was immediately given, and it was operated by the lessee until March 3, 1893, when a general creditors' bill was filed in the circuit court of the United States for the Southern district of Ohio, at Cincinnati, on behalf of all creditors and stockholders of the lessee company, and against the lessee company alone. The objects and purposes of the bill, as stated in its own language, were: "That for the purpose of enforcing the rights and equities of the creditors of said company, as well as of protecting the rights, interests, and property of said company, and to secure, so far as possible, the performance of the duties which said company owes to the public as a common carrier, as well as to preserve the unity of the business and property of the said railway company as the same has been maintained and operated since the year 1881, and of preventing disruption thereof by separate executions, attachments, or sequestrations, and of preventing the loss and forfeiture of its leasehold and other property by reason of its failure to pay the rental reserved thereon, as aforesaid, this court forthwith appoint a receiver of all and singular the property, rights, assets, and franchises of every nature, and wherever situated, held, owned, or controlled by said company, together with all leasehold rights and contracts, with full authority to manage and operate the same under direction of the court; and that all of the officers, managers, superintendents, agents, and employés of the said company be required forthwith to deliver up to such receiver the possession of all and singular each and every part of the said property, wherever situated, and also all books of account, vouchers, and papers

in any way relating to its business or the operation of its said railway, and for an injunction restraining each and every of the officers, directors, managers, superintendents, agents, and employés of the said company from in any way interfering with the possession and control of such receiver over said property. That at such time as may be found just and proper the property of said company may be ordered to be sold, and the proceeds be distributed among those entitled thereto; and that your orator may have such other and further relief as to the court may seem proper, and as may be necessary to fully protect and enforce the rights and equities of your orator and of all other creditors and stockholders of said company."

On the same day S. M. Felton was duly appointed managing receiver under the bill, with the powers usually given to a receiver of such property, including the power to operate the railroad, which he has continued to do to this time. In the year 1896, the receiver, by petition in proper form, applied to the court for authority to take down and rebuild certain iron bridges on account of the defective original construction thereof, as stated in the petition. It was stated that said bridges were originally so imperfectly constructed as not to possess the strength and capacity required for locomotives and cars of the weight necessary to be used on the road and connecting roads, and in general use throughout the United States. By order of the court, authority was given the receiver to construct spans of bridge work over the Ohio and Cumberland rivers, with one span over the Louisville & Nashville Railroad, which was done at a total expense of $113,069.30. In the order by which the receiver was authorized to construct these bridges and substitute them for the old ones the question whether the lessee or lessor was chargeable with the expense was expressly reserved. The receiver having expended the sum authorized in taking down the old bridges and substituting bridges of proper strength to suit the needs of modern freight traffic, the dependent bill, in which the litigation now before us had its origin, was filed by authority of the court. The city of Cincinnati and the trustees of the Cincinnati Southern Railway were made parties defendant to this bill, and by order subsequently made in the cause all creditors of the lessee company were allowed to be heard by counsel. The object of the bill was to secure a construction of the lease. The receiver's contention is that the expense of this reconstruction of the bridges and other like construction, which the bill shows would be necessary in the future, should be charged to the city, and that he should be allowed to withhold from the rental the amount already expended and which might hereafter be expended for like purposes. The covenants in the instrument of demise which affect more directly the question presented for decision are found in clauses 5 and 6, which are in these words:

Clause 5: "And the party of the second part further covenants and agrees with the party of the first part that said party of the second part will, whenever needed, do all repairs, replacements, and renewals on the said line of railway and its appendages, including the line of telegraph between the termini, and will maintain, preserve, and keep the same, and every part thereof, in thorough repair, working order, and condition, and at the end of this lease will deliver and surrender the same, with all additions to and improvements thereon, in such thorough repair, working order, and condition in which they are required to be put and kept by this lease; and such repairs and renewals to be made by the party of the second part shall include, among other things, the arching, with brick or stone, of the tunnels now lined with timber, or untimbered tunnels, which require arching; the filling of all wooden trestleworks requiring to be filled, and replacing all other wooden trestleworks and bridges with permanent structures of stone and iron; the construction of not less than twenty-five miles of additional side tracks and switches, and the thorough ballasting of the entire road, a suitable block-signal equipment, and all necessary station houses, platforms, cattle pens, tool houses, fencing, and other similar works; and shall be such that upon the surrender of the premises upon the termination of this lease the entire line of railway shall be complete in all respects, and in the condition of a first-class single-track railroad, with the rails of the main track of the most approved form, and of steel, or the most approved material, and of not less weight than sixty pounds to the yard, and throughout the entire line of road in a safe condition for the rapid and smooth

movement of passenger trains, and the regular transaction of the freight business of the road."

Clause 6: "And the party of the second part further covenants and agrees with the party of the first part that the said party of the second part will provide and keep the said line of railway supplied with rolling stock and equipment so that the business of the same shall be preserved, encouraged, and developed, and that the same shall at all times be done with safety and expedition, and the public accommodated in respect thereto with all practicable conveniences and facilities, and that all future growth of such business, as the same may arise or be reasonably anticipated, shall be fully provided for and secured, and that all reasonable efforts shall be used to maintain, develop, and increase the business of said line of railway; and, further, that it will pay and save harmless the party of the first part from the payment of any costs, expenses, claims, liabilities, damages, and demands whatsoever arising out of the possession, control, management, and operation of said line of railway and its appendages, or any part thereof, the said party of the second part taking upon itself the same duties, liabilities, and obligations in respect thereto as if it had become the owner thereof, and doing every act and thing that may by law be required of or be obligatory upon the lessee or said party of the first part, its successors or assigns; and that in the operation of said railway the said lessee will not discriminate against the citizens of Cincinnati in carrying freight or passengers on said line of railway, nor against freight or passengers from other railroads terminating in said city, and will charge and receive only the same, and no more, for the same services in transporting to and from said city freight and passengers going to and coming from one of said roads, that it charges and receives from those going to and coming from any other of said roads."

The city and the trustees demurred to the bill—First, on the ground that the receiver had no capacity to sue; and, second, on the ground that the bill stated no ground for relief against the lessor. The lease itself was, by proper reference, made a part of the bill, and the second question raised by the demurrer was whether the lessor was liable for the sum expended in rebuilding the iron bridges. The hearing on bill and demurrer resulted in a decree sustaining the demurrer and dismissing the bill, from which the receiver appealed, and assigns error.

Lawrence Maxwell, Jr., and Edward Colston, for appellant.

W. T. Porter and J. R. Sayler, for appellees sinking fund trustees and Wade H. Ellis.

The Assistant Corporation Counsel, for appellee city of Cincinnati.

Before LURTON, Circuit Judge, and SEVERENS and CLARK. District Judges.

CLARK, District Judge, after stating the case as above, delivered the opinion of the court.

The discussion in this court deals with the case in three several aspects, requiring consideration of how far the result is influenced or controlled: First, by common-law principles applicable independently of the covenants in the lease; second, by the terms, express and implied, in the lease contract; and, third, by equitable principles, which apply in view of the fact that the subject-matter of the lease is a railroad, and peculiar, and is operated by appellant as the court's receiver for the benefit of all parties interested. These questions have not, of course, been treated as of equal importance in their bearing on the case and the principal question. We will consider these points so far as it is deemed necessary.

The rule in regard to the mutual obligations of lessor and lessee is well established by the decided weight of authority. In the ab-

sence of express covenant or stipulation to the contrary, the lessor is not bound to repair, improve, or make additions, or to allow the lessee for repairs made without his authority. In the absence of fraud or misrepresentation, the lessee takes the property as he finds it, and at his peril, and there is no implied warranty or covenant in law on the part of the lessor in this respect. He is under no implied obligation with regard to the condition of the premises which are the subject of the demise, and is not bound to guaranty that the conditions will continue during the term. When the premises are leased for a specific purpose, there is no implied covenant that they are fit for such purpose, or that they shall remain so. This doctrine, except as modified by statute, is accepted everywhere in this country. In Viterbo v. Friedlander, 120 U. S. 707, 7 Sup. Ct. 962, the supreme court of the United States had occasion to point out that the common law and civil law differ in regard to the obligations of lessor and lessee in this regard. Mr. Justice Gray, speaking for the court, said:

"But as to the nature and effect of a lease for years at a certain rent, which the lessee agrees to pay, and containing no express covenant on the part of the lessor, the two systems differ materially. The common law regards such a lease as the grant of an estate for years, which the lessee takes a title in, and is bound to pay the stipulated rent for, notwithstanding any injury by flood, fire, or external violence, at least unless the injury is such a destruction of the land as to amount to an eviction; and by that law the lessor is under no implied covenant to repair, or even that the premises shall be fit for the purpose for which they are leased. Fowler v. Bott, 6 Mass. 63; 3 Kent, Comm. 465, 466; Broom, Leg. Max. (3d Ed.) 213, 214; Doupe v. Genin, 45 N. Y. 119; Kingsbury v. Westfall, 61 N. Y. 356; Naumberg v. Young, 44 N. J. Law, 331; Bowe v. Hunking, 135 Mass. 380; Warehouse Co. v. Carr, 5 C. P. Div. 507."

Chancellor Kent states this distinction between the two systems, and the advantage of the Roman lessee over the English lessee, as follows:

"The Roman law made some compensation to the lessee for the shortness of his five-years lease, for it gave him a claim upon the lessor for reimbursement for his reasonable improvements. The landlord was bound to repair, and the tenant was discharged from the rent if he was prevented from reaping and enjoying the crops by an extraordinary and unavoidable calamity, as tempests, fire, or enemies. In these respects the Roman lessee had the advantage of the English tenant, for, if there be no agreement or statute applicable to the case, the English landlord is not bound to repair, or to allow the tenant for repairs made without his authority; and the tenant is bound to pay the rent, and to repair at his own expense, to avoid the charge of permissive waste." 4 Kent, Comm. 110.

"And in modern cases," says the same author, "it has been held that the lessee or the assignee of a lease in which the lessee covenanted for himself and his assigns absolutely to repair was bound to repair, notwithstanding the buildings were accidentally destroyed by fire. And, if the premises be out of repair, the tenant cannot make repairs at the expense of the landlord, or deduct the amount of them out of the rent, unless there be a special agreement for that purpose between the tenant and his landlord." 3 Kent, Comm. 468.

So, in Kutter v. Smith, 2 Wall. 491, it was distinctly adjudged that the law imposes no obligation upon the landlord to pay the tenant for buildings erected on the demised premises. The established doctrine upon the subject in this country and in England is

also the law in Scotland. Bayne v. Walker, H. L. Cas. 1815, 3 Dow, 233, 15 Rev. Reports, 53. Nothing decided in Wait v. O'Neil, 47 U. S. App. 19, 22 C. C. A. 248, and 76 Fed. 408, qualifies or denies the general rule. While a railroad differs in form and uses from other species of property, generally the subject of lease, the analogy is too close to admit denial of the application of the general rule in questions between lessor and lessee. The subject of the lease in question was the roadbed, tracks, stations, and bridges. The law by which the rights and obligations of lessor and lessee are determined furnishes no foundation for the contention that the lessor is liable for the expense of rebuilding the bridges in question or other similar improvements, whether regarded as repairs or as reconstruction, by which "a new and different thing" is substituted for the old. The law no more imposes an obligation on the lessor to repay the tenant the expense of rebuilding than it does the expense of repairing. In the argument much attention was given by both sides to the question whether the rebuilding of the bridges in question is a "replacement," within the meaning of the lease contract, the expense of which is expressly provided for by covenant. So far as we find it necessary to deal with this question, it may be shortly disposed of. The contract throughout, so far as it provides for the expense of maintaining and operating the road, distinctly places the burden of such expense upon the lessee. This is done throughout the contract attentively and guardedly, as will sufficiently appear in clauses 5 and 6, set out in full in the statement of the case. It is not needful for the purposes of the case, as now presented, that we should notice or analyze the provisions of the contract in detail. It is sufficient to say that the contract neither in terms nor by implication imposes liability on the lessor for an expense of any kind incurred by the lessee. Indeed, it is not insisted for the appellant, as we understand, that the contract does so. The contention for the appellant in this connection is that the bridges rebuilt cannot be regarded as "repairs and replacements and renewals," within the meaning of clause 5 of the lease, and that it is not, therefore, such an expense as is provided for by covenant in the instrument of demise, but is left unprovided for and open to question. But, as will be seen, we do not find it necessary to deal with the point thus suggested. It is sufficient to repeat that there is no basis in the contract for holding the lessor responsible for such an expense. This much is clear, and the case does not require that the decision should go further in this particular direction.

The question remains whether the lessor is chargeable with the expenditure in question upon equitable and public grounds within the doctrine affirmed by the supreme court of the United States in a series of cases for the foreclosure of mortgages of railroad property accompanied with a receivership. It has been held in those cases that the peculiar character of railroad property justified the court, when called upon to entertain foreclosure proceedings, in requiring the payment of certain limited claims for debts created before the receivership. And upon the same grounds, and as part of the receivership operating expenses, debts were allowed to be created

for necessary repairs in the way of improvement and construction, when such outlays appeared to be reasonable, and for the benefit of all parties directly interested. Debts for rental and necessary equipment have been allowed as proper operating expenses of the receivership. We need not now consider in detail the character of claims thus allowed, nor distinguish between the limited claims allowed, which accrued before the receivership, and those which were created during the receivership, and constituting receiver's expenses. The questions presented in those cases related to priority of payment, and to what extent the lien of the mortgage might be displaced by expenditures made during the receivership. The issues in such cases were between mortgagee, mortgagor, and unsecured creditors. These cases begin with Fosdick v. Schall, 99 U. S. 238, include Union Trust Co. v. Illinois Midland R. Co., 117 U. S. 434, 6 Sup. Ct. 809, and extend to Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 18 Sup. Ct. 657. The receivership in the case at bar had its origin and has been continued on application of creditors of the lessee, and not at the instance of the lessor or creditors of the lessor. The situation of this case and the question now before us are so different that we are unable to see that those cases have any material application. In this case the question arises between the lessor and lessee's receiver, and in relation to the rental due under the lease contract, and is whether the burden of an outlay for reconstruction work upon the demised property rests upon the lessor or lessee. The original creditors' bill in this case was brought in the sole interest of the lessee company and its creditors. No party to this litigation occupies the position of mortgagor and owner of the property, as in the foreclosure cases to which we have referred, except the lessee company. The public obligation of maintaining and operating the railway rested upon the lessee company, which, in the litigation, for all practical purposes, takes the position of the mortgagor and owner in cases like Fosdick v. Schall, and subsequent cases of the same general class. Here the only property of the corporation operating the railway is the leasehold interest or estate. The appellant was not appointed receiver of the property or interests of the lessor. Lessor was not a party to the litigation when the receiver was appointed, and has not become a party at any stage of the case for the purpose of taking any part in furtherance of the original objects of the litigation. The public duty of maintaining the railroad as a highway for the purpose of commerce had been assumed by and rested upon the lessee company alone. All creditors here concerned are creditors, not of the lessor, but of the lessee; and such creditors have at no time had the right, in any event, to look to the property of the lessor for the satisfaction of their debts. The only relation which does or has existed between the lessor and the receiver has resulted from the fact that the court ordered the receiver to take possession of the leasehold property, and pay the rent due under the lease.

The objects of the suit under which the receivership was created and has been continued did not affect the rights or interests of the lessor, but were to operate and maintain the railroad, and thereby

preserve the leasehold estate, and finally distribute the proceeds of sale, together with any income and profits arising from the operation of the railway, to the creditors according to their priority, and the surplus, if any, to the stockholders in the lessee company. The lessor has simply exercised its right to collect rents due under the contract so long as the receiver is in possession of and managing and operating the railway. The receiver has not, so far as the record discloses, at any time offered to surrender the property and terminate the lease as to him, and, as we have stated, the receivership did not have its origin at the instance or on the application of the lessor, nor has the receivership been maintained at the instance of the lessor. Under such circumstances as these we do not see upon what ground the rental due the lessor is justly subject to any deduction on account of an expense incurred by the receiver in the operation of the road, whether in the way of necessary repairs or reconstruction and substitution. During the existence of this lease, and while the court, through its receiver, keeps the lease in force by payment of rent, the public duty, so far as that may be an element in determining the power of the court, was not a burden upon the lessor. The lessor is a public corporation, created for political purposes and for local civil government, with such powers as are essential to the corporate objects and purposes. It is but an arm of the state government. Without special legislative authority, its implied powers are limited to corporate purposes.

In considering the case we must also bear in mind that rent properly due for a railroad used by a receiver under the order of the court is a receivership expense, and entitled to preferential payment. Brown v. Railroad Co., 35 Fed. 444; Mercantile Trust Co. v. Farmers' Loan & Trust Co., 49 U. S. App. 662, 26 C. C. A. 383, and 81 Fed. 254; Central Trust Co. v. Continental Trust Co., 58 U. S. App. 604, 30 C. C. A. 235, and 86 Fed. 517; Woodruff v. Railway Co., 93 N. Y. 609. In view of these and other considerations, not necessary to be stated, which distinguish the case at bar from the ordinary case in the well-known group of foreclosure cases already mentioned, we conclude that those cases are not applicable, and are not authority for appellant's contention in this regard. We are clear, as we have said in the opinion, that appellant's contention is not sustained by covenant or stipulation in the instrument of demise, nor by any covenant implied by law.

Entertaining these views, we do not find it necessary to decide whether the lessee or its receiver, the appellant, is obliged, under the contract of lease, to rebuild these bridges, or to do other similar reconstruction work. It sufficiently disposes of the case to say that in the situation disclosed by the record such reconstruction or improvement cannot be made at the expense of the appellee. If the receiver, by authority of the court, should offer to surrender the leased property, and the city refuse to accept the same, a question might arise not now presented. The suggestion that the receiver cannot bring this suit, although under order of the court, can hardly be regarded as serious. The practice adopted by the court below is

clearly the proper one, and is supported by Woodruff v. Railway Co., 93 N. Y. 610.

The decree of the circuit court was right, and is accordingly affirmed.