JAMES et al. v. GERMANIA IRON CO.

BELDEN v. MIDWAY CO.

(Circuit Court of Appeals, Eighth Circuit. March 28, 1901.)

Nos. 1,434, 1,433.

1. LAND DEPARTMENT OF THE UNITED STATES—JUDICIAL POWER AND ITS EFFECT.

The land department of the United States is a quasi judicial tribunal, invested with authority to hear and determine claims to the public lands subject to its disposition, and its decisions of the issues presented at such hearings, and its patents issued thereon, are impervious to collateral attack.

2. PATENTS AND DECISIONS OF LAND DEPARTMENT—HOW DIRECTLY ASSAILED.

But a patent or decision of the land department is not impregnable to direct attack. The legal title derived from it may be charged with a trust for the benefit of the party lawfully entitled to it either on the ground (1) that, upon the facts found, conceded, or established without dispute at the final hearing before the department, its officers fell into a clear error in the construction of the law applicable to the case which caused them to issue the patent to the wrong party, or for the reason (2) that through fraud or gross mistake they fell into a misapprehension of the facts proved before them which had the like effect.

3. LAND DEPARTMENT'S FINDING OF FACT—HOW ASSAILED.

One who would attack a patent or decision of the department for a mistake of fact, however, must plead and prove the evidence before the department from which the mistake resulted, the particular mistake that was made, the way in which it occurred, and the fact that, if it had not been made, the decision would have been otherwise, and the patent would not have issued to the patentee, before any court can enter upon the consideration of the original issue of fact determined by the department.

4. EQUITABLE TITLE NOT DEVESTED BY SUBSEQUENT RULES OR DECISIONS OF DEPARTMENT.

The equitable title to land acquired by a lawful entry cannot be devested or affected by subsequent decisions of the land department, or subsequent rules or modification of rules of practice therein.

5. ENTRY OF PUBLIC LAND, WHETHER VOID OR VALID, WITHDRAWS IT FROM SALE UNTIL CANCELED.

The entry of public land under the laws of the United States, whether legal or illegal, segregates it from the public domain, appropriates it to private use, and withdraws it from subsequent entry or acquisition until the prior entry is officially canceled and removed.

6. RULES OF PRACTICE OF DEPARTMENT MAY BE ABROGATED BY FORMAL REPEAL AND PUBLICATION THEREOF ONLY, AND NOT BY DECISIONS IGNORING OR VIOLATING THEM IN PARTICULAR CONTESTS.

Rules of practice of the land department formally established and promulgated by authority of the secretary of the interior, can be repealed or abrogated by like formal action and publication only. Decisions or opinions of the secretary and the commissioner in contests between

claimants for specific tracts of land ignoring or violating rules neither repeal nor modify them.

7. UNDER THE RULES OF THE DEPARTMENT IN 1889 LAND IN CONTEST WAS WITHDRAWN FROM ACQUISITION OR ENTRY UNTIL THE DECISION OF THE SECRETARY OR COMMISSIONER AVOIDING THE PRIOR ENTRY WAS OFFICIALLY COMMUNICATED TO THE LOCAL LAND OFFICERS.

The rule of practice of the land department that after the local land officers made their reports to the commissioner of a contest over an entry of land they should "thereafter take no further action affecting the disposal of the land in contest until instructed by the commissioner" was in force in 1889, and it prohibited the acquisition of any legal or equitable right to the land through the local land officers during the time between the date of a decision or judgment of the secretary or commissioner canceling the prior entry and the receipt by the local land officers of official notice of that judgment as well as during the time between the making of the original reports of the contest and the date of the decision.

8. FACTS OF THIS CASE AND RULING.

On February 18, 1889, the secretary of the interior decided that a prior entry of a certain tract of land was void, and that the land was open to disposal under the land laws. This decision was communicated to the local land officers on February 22, 1889. On February 19, 1889, A. made an application to the local officers to enter the land. B. was the first applicant to enter it after the local officers received official notice of the decision canceling the prior entry. The secretary decided that A. acquired the superior right to the land, and issued a patent in accordance with this conclusion. *Held*, this decision was a clear error of law, and B., the first applicant after the local officers were officially notified of the decision, was entitled to a decree charging the title under the patent with a trust for his benefit.

9. ONE WHO' CONDUCTS LITIGATION IN ANOTHER'S NAME IS ESTOPPED BY THE JUDGMENT THEREIN.

A party who institutes and conducts a litigation in another's name is as conclusively estopped by the decision and judgment therein from again litigating the same issues with his adversary as is the party in whose name he carries on the contest.

10. ESTOPPEL OF JUDGMENT—EXTENT.

In an action between the same parties or those in privity with them upon the same claim or demand, a decision upon the merits is conclusive not only as to every matter offered, but as to every admissible matter which might have been offered, to sustain or defeat the claim or demand. But in a case in which the second litigation is upon a different claim or demand the prior judgment is an estoppel as to those matters in issue or points in controversy which were actually litigated and decided, and upon which the finding or judgment was based.

11. ESTOPPEL IN PAIS BY DISCLAIMER OF TITLE.

As against an innocent purchaser of Porterfield scrip, the government, and, a fortiori, a stranger, are estopped from claiming that the government is the owner, or that the land warrant is invalid, because a former owner twice tendered it to the United States in payment for a cash entry and patent of land, and the government twice refused to accept it.

(Syllabus by the Court.)

Appeals from the Circuit Court of the United States for the District of Minnesota.

These appeals challenge decrees to the effect that the appellants hold their title to the N. W. ¼ of the S. E. ¼ of section 30, in township 63 N., of range 11 W. of the fourth P. M., in the state of Minnesota, in trust for the appellees. The decree in the suit first named evidences the result of the trial of the issues tendered by the bill in equity which was sustained by this court in Iron Co. v. James, 32 C. C. A. 348, 89 Fed. 811. Subsequent to the commencement of that suit the Germania Iron Company conveyed its interest in the land to the Midway Company, a corporation, and another suit was brought

by that company against James Belden, who had succeeded to the interest of some of the defendants in the earlier suit. The second suit rests upon the same basis as the first, and the only new issue of any importance that it tenders is the bona fides of Belden's purchase. The two suits were heard and decided together below, and they will hereafter be treated as one in this court.

This litigation is a contest between the Midway Company, the appellee, which claims an equitable title, and Houghton E. James, James Belden, and Charles W. Hillard, the appellants, who hold the legal title, to the land in dispute under a patent issued to William Craig on October 23, 1896. On February 18, 1889, this land was, and long had been, segregated from the public domain, and appropriated to private use by the previous location of Sioux half-breed scrip upon it. A contest had arisen over it between the locator of the scrip and one who applied to, pre-empt the land, had been heard by the local land officers, and had, by proper appeals, been presented to 'the secretary of the interior for decision. On that day the secretary filed a decision directed to the commissioner of the general land office in which he held that the location of the scrip was invalid, that the attempted pre-emption was fraudulent and void, and that the judgment of the department was that the land in question was open to disposal under the public land laws of the United States applicable thereto. The local land officers at Duluth were first officially informed of this decision on February 22, 1889, which was a holiday, and on the morning of February 23, 1889, before opening their office for business, the entry of this land with the Sioux scrip was first canceled on the books and plats of the local land office. They opened their office promptly at 9 o'clock on the morning of that day. There was a large crowd of people besieging the office and waiting to secure this 40 acres of land, and when the door was open Emil Hartmann in person and Warren N. Draper in the name of Charles P. Wheeler each applied to enter it with Porterfield land warrants. The register and receiver found that Hartmann's application was first in time, and accepted and allowed his entry. The appellee has succeeded to the interest thus secured by Hartmann. After the decision of the secretary on February 18, 1889, and again on February 19, 1889, Houghton E. James applied to the local land officers at Duluth to make a homestead entry of this land, and they rejected his application because the land was covered by the prior entry with Sioux scrip. In this state of the case a contest arose between Hartmann, Wheeler, and James for this land, and this contest was carried by appeals to the secretary of the interior, who, on December 21, 1894, decided that the attempted homestead entry by James before the decision of February 18, 1889, was officially communicated to the local land officers, and before the entry with the Sioux scrip had been canceled on their books and plats was valid and effectual, and entitled to priority over the entry of Hartmann. In pursuance of this decision Hartmann's entry was canceled, and James entered the land as a homestead on August 6, 1895. On September 23, 1895, pursuant to an agreement made between him and Warren N. Draper, an attorney at law, James relinquished his claim to this land to the United States, and William Craig entered it with Porterfield land warrant No. 75. Three days later Craig and his wife, at the suggestion of Draper, made a mining lease of the land for 50 years to Joseph H. Chandler, an attorney at law. On the same day Craig and his wife conveyed an undivided half of the land to Houghton E. James. James received $6,500 and this deed for his relinquishment. On October 10, 1895, Chandler assigned the mining lease to the appellee C. W. Hillard. On February 5, 1896, Craig and his wife conveyed their remaining half of the land to James Belden for $12,000, subject to the mining lease; and on March 16, 1898, James gave to Belden an option to purchase his half of the land. In its pleadings and at the hearing the appellee insisted: (1) That the secretary, in his decision of December 21, 1894, found that Hartmann was the first to apply to enter the land after the cancellation on February 23, 1889, of the prior entry of it with the Sioux scrip; (2) that he failed to secure a patent to it for the sole reason that the secretary erroneously held the law to be that an application to enter land after a decision of the secretary that a prior entry is invalid, and before that decision is communicated to the local land officers, and before the prior entry

is canceled on the books of their office, is superior in right to the first entry after such cancellation; and (3) that the appellants were the privies of the parties to that decision, and were bound by it. The appellants contended that the secretary never found the fact that Hartmann was the first to apply to enter the land after the cancellation of the prior entry on the books and plats; that they were not parties or privies to that decision, but were bona fide purchasers under an independent title without notice of Hartmann's equities, and that the secretary fell into no error in his decision of the question of law. The court below sustained the claims of the appellee, and entered decrees accordingly.

Frank B. Kellogg and James K. Redington, for appellants.

Walter Ayers (P. H. Seymour, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The land department of the United States is a quasi judicial tribunal, invested with authority to hear and determine claims to the public lands subject to its disposition, and its decisions of the issues presented at such hearings are impervious to collateral attack, and presumptively right. A patent to land of the disposition of which the department has jurisdiction is both the judgment of that tribunal and a conveyance of the legal title to the land. 9 Stat. 395, c. 108, § 3; Rev. St. §§ 441, 453; U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 955, 15 C. C. A. 96, 103, 32 U. S. App. 272, 283. But the judgment and conveyance of the department do not conclude the rights of the claimants to the land. They rest on established principles of law and fixed rules of procedure, which condition their initiation and prosecution, the application of which to the facts of each case determines its right decision; and, if the officers of the land department are induced to issue a patent to the wrong party by an erroneous view of the law, or by a gross or fraudulent mistake of the facts, the rightful claimant is not remediless. He may avoid this decision, and charge the legal title derived from the patent which they issue with his equitable right to it on either of two grounds: (1) That upon the facts found, conceded, or established without dispute at the hearing before the department its officers fell into an error in the construction of the law applicable to the case which caused them to refuse to issue the patent to him, and to give it to another (Bogan v. Mortgage Co., 63 Fed. 192, 195, 11 C. C. A. 128, 130, 27 U. S. App. 346, 350; U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 958, 15 C. C. A. 96, 106, 32 U. S. App. 272, 288; U. S. v. Northern Pac. R. Co., 95 Fed. 864, 870, 37 C. C. A. 290, 296; Cunningham v. Ashley, 14 How. 377, 14 L. Ed. 462; Barnard's Heirs v. Ashley's Heirs, 18 How. 43, 15 L. Ed. 285; Garland v. Wynn, 20 How. 6, 15 L. Ed. 801; Lytle v. Arkansas, 22 How. 193, 16 L. Ed. 306; Lindsey v. Hawes, 2 Black, 554, 562, 17 L. Ed. 265; Johnson v. Towsley, 13 Wall. 72, 85, 20 L. Ed. 485; Moore v. Robbins, 96 U. S. 530, 538, 24 L. Ed. 848; Bernier v. Bernier, 147 U. S. 242, 13 Sup. Ct. 244, 37 L. Ed. 152); or (2) that through fraud or gross mistake they fell into a misapprehension of the facts proved before them, which had the like effect (Gonzales v. French, 164 U. S. 338, 342, 17 Sup. Ct.

102, 41 L. Ed. 458). If he would attack the patent on the latter ground, and avoid the department's finding of facts, however, he must allege and prove not only that there was a mistake in the finding, but the evidence before the department from which the mistake resulted, the particular mistake that was made, the way in which it occurred, and the fraud, if any, which induced it, before any court can enter upon the consideration of any issue of fact determined by the officers of the department at the hearing. U. S. v. Northern Pac. R. Co., 95 Fed. 864, 870, 882, 37 C. C. A. 290, 296, 308; U. S. v. Atherton, 102 U. S. 372, 374, 26 L. Ed. 213; U. S. v. Budd, 144 U. S. 154, 167, 168, 12 Sup. Ct. 575, 36 L. Ed. 384; U. S. v. Mackintosh, 85 Fed. 333, 336, 29 C. C. A. 176, 179, 56 U. S. App. 483, 490; U. S. v. Throckmorton, 98 U. S. 61, 66, 68, 25 L. Ed. 93; Marquez v. Frisbie, 101 U. S. 473, 476, 25 L. Ed. 800; Steel v. Refining Co., 106 U. S. 447, 451, 1 Sup. Ct. 389, 27 L. Ed. 226; French v. Fyan, 93 U. S. 169, 172, 23 L. Ed. 812; Ehrhardt v. Hogaboom, 115 U. S. 67, 69, 5 Sup. Ct. 1157, 29 L. Ed. 346; Heath v. Wallace, 138 U. S. 573, 575, 11 Sup. Ct. 380, 34 L. Ed. 1063; Barden v. Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992. The bill in the case before us is based on the first ground. The complainant alleged that the facts were, and that the secretary of the interior at the final hearing before him on December 21, 1894, found them to be, that Hartmann was the first qualified applicant for the land after the prior entry of it with Sioux scrip was canceled on the books and plats at the local land office at Duluth on February 23, 1889, and after the local land officers were officially informed of the decision of the secretary of the interior of February 18, 1889, to the effect that the prior entry was void; that James' application to make a homestead entry of the land was made on February 19, 1889, three days before the local officers received official notice of the decision, while the land was still covered by the prior entry, and four days before it was canceled by the local officers; and that upon this state of facts he erroneously held the law to be that James acquired the superior right to the land in violation of an established rule, a settled practice, and a long line of decisions of the land department that no rights to enter or to secure the entry of land covered by a prior entry can be acquired by strangers to the litigation at the local land office before the decision of the invalidity of the prior entry is officially communicated to the local land officers, and the prior entry is canceled on the books and plats in their office. The complainant also alleged that all the parties who have claimed or do claim this land under James or Craig took their interest in it with notice of this decision and of the complainant's equitable title to the land. Upon the demurrer to this bill this court held that its allegations stated a strong and manifest equity in the complainant, which charged the legal title under the patent with a trust in its favor, and entitled it to the relief it sought. Iron Co. v. James, 89 Fed. 811, 817, 818, 32 C. C. A. 348, 354, 355, 61 U. S. App. 1, 10. Answers to the bill have since been interposed, the case has been heard on its merits, and the court below has found that the averments of the bill are sustained by the proof, and has granted decrees accordingly.

The only question, therefore, which is left for consideration is whether or not this finding is sustained by the evidence, and it comes here with the presumption of soundness and with the burden on the appellants to show its error. Mann v. Bank, 86 Fed. 51, 53, 29 C. C. A. 547, 549, 57 U. S. App. 634, 637; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821, 36 L. Ed. 649; Warren v. Burt, 58 Fed. 101, 106, 7 C. C. A. 105, 110, 12 U. S. App. 591, 600; Plow Co. v. Carson, 72 Fed. 387, 388, 18 C. C. A. 606, 607, 36 U. S. App. 448, 456; Trust Co. v. McClure, 78 Fed. 209, 210, 24 C. C. A. 64, 65, 49 U. S. App. 43, 46; Exploration Co. v. Adams (C. C. A.) 104 Fed. 404, 408. They attack it on three grounds: (1) That there was no rule, practice, or line of decisions in the land department to the effect that strangers to litigation therein could not acquire rights to land at the local land office after the decision of the secretary or land commissioner that a prior entry was void, and before its communication to the local land officers, and their cancellation of the entry on their books and plats; (2) that the secretary did not in his decision of December 21, 1894, find that Hartmann was the first qualified applicant to enter the 40 acres here in controversy after the cancellation of the prior entry; and (3) that, if he did, the appellants are bona fide purchasers of the land under an independent title, and are not bound by the finding. Was there such a rule, practice, or line of decisions on February 23, 1889, when the rights of Hartmann, Wheeler, and James to this land, whatever they were, became fixed and vested? Many questions have been argued and many decisions have been cited in the briefs of counsel which have little, if any, relevancy to this question; and, before discussing it, some of these will be briefly mentioned and their immateriality noticed. The rights of these parties vested on February 23, 1889. They were initiated under and conditioned by the laws of the land and the rules and practice of the department on that day, and no subsequent rules, decisions, or practice could devest them of the property they then secured, or deprive them of their equitable or legal rights to the title to the land which they then acquired. Cornelius v. Kessel, 128 U. S. 456, 461, 9 Sup. Ct. 122, 32 L. Ed. 482; Shreve v. Cheesman, 69 Fed. 785, 792, 16 C. C. A. 413, 419, 32 U. S. App. 676, 689. For this reason the subsequent practice and decisions of the department, which have been carefully considered, will not be reviewed at length in this opinion, but will be here laid aside with the remark that they are without legal effect upon the issues in this case, and their examination has proved futile and profitless. Much has been said and written to prove that the decision of the secretary of February 18, 1889, was a final judgment of the land department, and that it took effect when rendered. The case in which that decision was made was a contest between Orilie Stram and Angus McDonald. Conceding, but not deciding, that the secretary's decision was a final judgment of the invalidity of their claims against the United States and against each other, the crucial question in this case still remains unanswered. That question is whether or not, under that decision, the prior entry of Orilie Stram

was removed from the land, and it was opened to acquisition by strangers to that contest, under the rules and practice of the department before the local land officers canceled the entry, or were informed of the decision. None of the parties to this litigation were parties to that contest, and the question is not the finality of that judgment, but the time when after that decision, under the rules and practice of the department, the land became open to acquisition by strangers. For this reason the question of the finality of that judgment is not material to the real issue in this case, and it will be here dismissed with the note that, conceding its finality, it was the judgment of an appellate tribunal; it was in the form of a letter directed to the officer from whose decision the appeal was taken; it closed with words which show beyond doubt that the secretary never intended that the land should be acquired by any one in violation of the rules or practice of the department; and by all analogy such a decision of an appellate court has no effect in the inferior tribunal, where rights and contests are initiated until it is received and acted upon by that tribunal. Iron Co. v. James, 89 Fed. 816, 32 C. C. A. 353, 61 U. S. App. 9. The closing words of the letter to the commissioner which embodied the decision were:

"This disposes of all the claims to the land, so far as disclosed by the record before me, and leaves the land in question open to disposal under the public land laws of the United States applicable thereto, and such is the judgment of this department. The papers in the case are herewith returned."

Turning now to the question at issue, the following propositions will be found to be established beyond controversy: The entry of the land by Stram with his half-breed scrip, whether valid or void, segregated it from the public domain, and appropriated it to private use, so that no legal entry of it could be made by James, or by any other applicant, before the local land officers received notice of the decision of the secretary, and canceled it on their books and plats. Hartman v. Warren, 76 Fed. 157, 160, 22 C. C. A. 30, 33, 40 U. S. App. 245, 250; Wilcox v. Jackson, 13 Pet. 498, 513, 10 L. Ed. 264; Witherspoon v. Duncan, 4 Wall. 210, 218, 18 L. Ed. 839; Carroll v. Safford, 3 How. 441, 11 L. Ed. 671; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; McIntyre v. Roeschlaub (C. C.) 37 Fed. 556; Railroad Co v. Forseth, 3 Land Dec. Dep. Int. 446, 447; Railroad Co. v. Leech, Id. 506; Hollants v. Sullivan, 5 Land Dec. Dep. Int. 115, 118; In re Milne, 14 Land Dec. Dep. Int. 242. There was a rule, a practice, and a long line of decisions of the department in force in 1889 to the effect that the register and receiver of the local land office could neither allow an entry, receive an application, nor do any other act affecting the disposition of land after an entry of it had been allowed, and while a contest over it was pending and undecided. Smith v. Oakes, 1 Land Dec. Dep. Int. 181; Hawker v. Fowlks, 2 Land Dec. Dep. Int. 53; Hoyt v. Sullivan, Id. 283; In re Fritzsche, 3 Land Dec. Dep. Int. 208; Keith v. Townsite of Grand Junction, Id. 431; Gilbert v. Spearing, 4 Land Dec. Dep. Int. 463; Grove v. Crooks, 7 Land Dec. Dep. Int. 140; In re Peterson, 8 Land Dec. Dep. Int. 121. Counsel for the appellants admit the soundness and force of these po-

sitions, and they also concede that after the decision of a pending contest, and before receipt of official notice of it by the local land officers, the latter could not legally allow an entry of the land under the established rules and practice of the department. Their contention is, however, that the rule and practice of the department was that while, during the interim between the decision above and its receipt below, the local officers could not lawfully allow an entry, it was their legal duty to receive and hold all applications to enter tendered to them until they received notice of the decision, and canceled the prior entry, and then to give preference in the entry to the first application presented after the date of the decision, and before notice of it was communicated. In other words, their position is that, while the local officers had no authority to allow an entry, they had the power to allow an acquisition of the land between the date of the decision and their receipt of official information of it. Such a rule and practice, if it existed, was pernicious, and in the teeth of the policy and provisions of the land laws of the United States, for the reasons stated more at length in the opinion upon the demurrer in 32 C. C. A., at pages 350–352, 89 Fed., at pages 814, 815, a perusal of which here is invoked. It was pernicious because it gave the preference over the citizens of the vicinage to a sentinel stationed in the secretary's office at Washington, more than 1,000 miles away, and presented facile opportunities for secret, mischievous, and scandalous machinations. It was inconsistent with the policy and terms of the land laws because it permitted the acquisition of land without record thereof, and made the right to acquire it dependent not upon the state of the records in the local land office, which were open to examination, and easy of access to the citizens of the district in which it was situated, but upon the earliest information of a decision filed more than 1,000 miles away, which few, if any, of the citizens of the neighborhood would have a chance of obtaining, when the theory and provisions of the land laws are that a clear and open record of the acquisition of every right to land through the land department shall be immediately made in the books and plats in the local land office of the district in which the land is situated, that the state of the title and of the claims to the public land shall always be of record and open to the inspection of the people in the local land office, and that every citizen of the vicinage shall thus have equal notice of opportunities to obtain and equal chance to secure any tract of public land in his district. 2 Stat. 73, c. 55, §§ 7, 8; Rev. St. §§ 2223, 2247, 2295. It was the converse of this contention—the rule and practice that the land remained withdrawn from acquisition at the local land office until the decision of the secretary that the prior entry was void was officially made known to the local officers and until the notation of its cancellation was made on their plats and records—which the court below found to exist on February 23, 1889. Does the record sustain this finding? Counsel for appellants maintain that this is a question of fact; that the decision of the secretary on December 21, 1894, found that no such rule or practice existed; and that, therefore, this issue is not open for the consideration of the courts. If the premise of this argument were sound, the conclusion would be inevitable. But the record discloses

the fact that the issue here is not whether or not certain written or printed rules were adopted, or certain decisions rendered, but it is, what was the true construction and legal effect of certain rules and decisions of the department whose existence on February 23, 1889, all parties admitted at the trial before the secretary in 1894, and conceded in the hearing before the court below? That inquiry presents no issue of fact, but a clear question of law, which our system of jurisprudence has imposed upon the courts the duty of considering and deciding.

The principles and rules to which reference has already been made and the following rules and decisions of the land department condition the determination of this issue. On December 1, 1875, the commissioner of the general land office, in a circular to the registers and receivers of the United States land offices, wrote concerning investigations of the rights of contesting claimants to land that "the observance of certain fixed general rules will tend to promote uniformity and dispatch in proceedings, and will materially aid registers and receivers in the performance of this delicate and highly important duty," and announced that the following rule regarding contested cases had been adopted by the department:

"Having carefully taken and examined **the evidence**, the register and receiver will render thereon their joint report and opinion, with full and specific reference to the posting and annotations upon their records, subject to the appeal hereinafter provided in these regulations, and will forward the entire record to the general land office, with a brief letter of transmittal, describing the case by its title, the nature of the contest, and the tract involved, and thereafter take no further action affecting the disposal of the land until instructed by the commissioner."

2 Copp, Landowner, pp. 154, 155.

On January 8, 1878, the commissioner of the general land office issued a circular to the registers and receivers, which contains these words:

"Gentlemen: By direction of the honorable secretary of the interior, dated the 22d ultimo, your attention is called to the practice prevailing at many district offices of admitting entries and filings upon papers prepared and left in the hands of registers and receivers, and of attorneys practicing before them, prior to the cancellation of an invalid entry under a pending contest or relinquishment, by which practice parties hope and expect to secure a priority of right by having the entry allowed immediately upon the receipt of notice of cancellation. The receipt of such applications and declaratory statements is not authorized by law or by your instructions, and must be discontinued. In the general circular of May 18, 1876, page 6, paragraph 19, respecting the presentation of applications after contest, it is provided that the contestant 'must, if he desires the land, by proper diligence ascertain when notice of cancellation is received by the register and receiver, and then make formal written application for the tract; the land, after reception by said officers of notice of cancellation, being always open to the first legal applicant, unless withdrawn from entry by competent authority.' This instruction will be found also on page 7 of the revised circular of December 1, 1877. Its purport is plain to the effect that an application, to be valid, must be made at a time when the land is free from appropriation, and legally subject to entry, and no other should be considered."

4 Copp, Landowner, p. 167.

On October 9, 1878, the commissioner issued another circular to the local land officers, in which he announced that the revised rules of

practice embodied therein had been adopted by the department. This revision contains a verbatim copy of the rule of 1875 which has been quoted above. 7 Copp, Landowner, p. 153. This rule remained in force without abrogation or substantial modification from 1875 until after 1889. In a revision of the rules issued in 1885 it appears in three rules numbered 51, 52, and 53, and they read:

"Rule 51. Upon the termination of a contest the register and receiver will render a joint report and opinion in the case, making full and specific reference to the postings and annotations upon their records.

"Rule 52. The register and receiver will promptly forward their report, together with the testimony and all the papers in the case, to the commissioner of the general land office, with a brief letter of transmittal, describing the case by its title, the nature of the contest, and the tract involved.

"Rule 53. The local officers will thereafter take no further action affecting the disposal of the land in contest until instructed by the commissioner."

In Crystal v. Dahl, Copp, Pub. Land Laws (1869–1875) 316, and Eno v. McDonald, Id. 317, the secretary of the interior decided that no rights to land could be initiated between the date of a decision of the commissioner holding a prior entry void and the receipt of notice of it by the local land officers. In the latter case the decision that the prior entry was void was rendered on October 16, 1872. It was received at the local office on October 29, 1872. One McDonald alleged settlement on October 26, 1872. The secretary said:

"The cancellation of the prior homestead entry took effect when notice of such cancellation was received at the local office, and then, and not till then, was the land subject to entry and settlement. Crystal v. Dahl, Secretary's Decision April 13, 1872. 2 Op. Asst. Attys. Gen. p. 5."

The rule announced in this case in 1874 was recognized as the established practice of the department in 1880 in Jayne v. Gowdy, 7 Copp, Landowner, 137; in 1883 in Pomeroy v. Wright, 2 Land Dec. Dep. Int. 164; and in 1888 in Perkins v. Robson, 6 Land. Dec. Dep. Int. 828.

Counsel for the appellants rely upon the decisions in the following cases to support their proposition that this rule and the practice disclosed by the decisions in Crystal v. Dahl and Eno v. McDonald are inapplicable to the case in hand, and that they were abrogated prior to 1889; Pomeroy v. Wright, 2 Land Dec. Dep. Int. 164; Ryan v. Conley, 4 Land Dec. Dep. Int. 246, 248; In re Reed, 6 Land Dec. Dep. Int. 563; Barclay v. California, Id. 699; Anderson v. Railroad Co., 7 Land Dec. Dep. Int. 163. Bearing in mind that the rule was that, after sending forward their reports in a contested case, the register and receiver should "take no further action affecting the disposal of the land in contest until instructed by the commissioner," and that the issue here involves its application not to claims of parties to the contest, but to those of strangers to it, let us see if there is anything in these decisions which repealed or modified this rule or the practice which had certainly grown up in conformity with it.

Pomeroy v. Wright, 2 Land Dec. Dep. Int. 164, which was decided in 1883, involved the rights of the parties to the original contest, not the right of strangers to such a contest. It involved the time when the right of the defeated entryman to purchase the land under the act of June 15, 1880, expired, and the right of the successful contestant

to enter it under the act of May 14, 1880, accrued. The secretary held that the decision of the commissioner was a final judgment between the parties to such a contest, and that the right of the one ceased and that of the other accrued at its date. But this decision rests upon the special provisions of the acts of congress mentioned above, and does not determine when the rights of strangers to the contest accrue. It distinguishes the case in which it is rendered from those governed by rule 53, and expressly concedes the existence of the general rule and of the practice which it prescribes. The secretary says:

"Nor is there any conflict between the rule laid down here and the established rule of the land department, referred to by counsel for Wright and in your decision aforesaid, that cancellation takes effect by a formal act at the local office. That rule is made for a different purpose, and is founded on another law, or construction of law, which reserved all land covered by an entry, and declares it not to be 'public land.' When the entry is canceled in fact, the reservation is removed, and the land is restored to the public domain."

It would be difficult to conceive of more conclusive proof of the rule and practice found by the court below than these remarks of the secretary, and the fact that the commissioner in his decision which the secretary was reviewing cited and followed it. And it is interesting to note, although the fact has no relevancy to the issues in this case, that, after numerous conflicting decisions, the department has finally practically applied the provisions of rule 53 to the rights of claimants under the acts of June 15 and May 14, 1880. Stewart v. Peterson, 28 Land Dec. Dep. Int. 515, 519.

Ryan v. Conley, 4 Land Dec. Dep. Int. 246, 248, decided in 1885, was a case in which the decision forfeiting the prior entry was made by the local officers themselves, so that it was within their knowledge and in their office ever after it was rendered, but they failed for some time to note upon their records the cancellation which they had adjudged. The secretary simply held that their failure to perform the clerical act of noting the cancellation on the plats and records did not withhold the land from entry. No provision of rule 53 was violated or affected by this ruling, because the contest had never been sent to the commissioner, and the rule had no application to the case.

In the case of In re Reed, 6 Land Dec. Dep. Int. 563, decided in 1888, there is an obiter dictum of the secretary in accord with the contention of counsel for the appellants. He there says that a decision of the commissioner on December 27, 1884, canceling the entry of George G. Reed, was a final judgment which opened the land to subsequent entrymen, and that, consequently, the application of John H. Reed to enter the land on January 23, 1885, should have been allowed. But the decision of the commissioner of December 27, 1884, had been received by the local land officers, and they had canceled the prior entry of George G. Reed on January 5, 1885, 18 days before John H. Reed applied to make his entry, so that there was no question of the right to enter the land after the decision and before its official communication involved in the case. The truth is that the secretary was not considering or discussing this question, but was arguing and deciding the issue whether or not an entry could be permitted after a

decision and before the expiration of the time allowed for an appeal, and it was with reference to that question and that time only that he suggested the dangerous practice which counsel seek to establish as a general rule in these words:

"In such cases the proper practice would be to receive the application subject to the right of appeal, but not to allow the entry to be made of record until the rights of the former entryman have been finally determined, either by the expiration of the time allowed for appeal or by the judgment of the appellate tribunal."

The opinion in Barclay v. California, 6 Land Dec. Dep. Int. 699, filed in 1888, merely holds, on the authority of the Reed Case, that a deficiency used as the basis of a selection of school-indemnity lands is freed from the date of a decision canceling the selection so that it may be used as the basis of another selection, although the time to appeal from that decision has not expired. The case did not involve the power of local land officers to receive applications, and violate rule 53, nor was that question discussed or referred to in any way.

In Anderson v. Railroad Co., 7 Land Dec. Dep. Int. 163, decided in 1888, the secretary held, on the authority of the obiter dictum in the Reed Case, without discussing the question, or referring to rule 53, or the practice under it, that the decision of the commissioner canceling an entry took effect from its date, and before the cancellation was entered in the local land office, so that the filing of the line of definite location of the St. Paul & Pacific Railroad meanwhile vested the right to the land in the railroad company. Even this decision, however, in no way violates or modifies rule 53, because the map of definite location was not filed with the local land officers, but in the office at Washington; and the local officers neither took, nor were they asked to take, any action affecting the disposal of the land before they received the decision.

This completes the recital of the rules and decisions which condition the determination of the question before us, and we are now ready to enter upon its decision. It is earnestly contended that there is a marked distinction between the cases in which a cancellation of an entry is adjudged by the secretary or commissioner and those in which the decision is that the entry shall be held for cancellation, that in the former class the register and receiver are empowered to receive applications before they are officially notified of the decision, while in the latter class they may not. But this is a distinction without reason and without a difference, born of the zeal and ingenuity of counsel, and first found in the books in the erroneous decision of the secretary in this case on December 21, 1894. The rule forbade any action by the local officers affecting the disposal of the land until instructed by the commissioner, and under it they were as peremptorily prohibited from acting after a judgment of cancellation above, and before the commissioner informed them of and instructed them concerning it, as they were from acting under a decision holding an entry for cancellation before they were informed of it. The mischief to be remedied and the purpose of the rule were the same in the one case as in the other, and the rule itself was without exception, and alike applicable to both.

It is sometimes claimed in the briefs for the appellants that the mere receipt of applications to enter land and the subsequent allow-ance to the first applicant of a preferential right of entry when the decision is received is not a violation of rule 53, because it does not allow an entry before the receipt of notice of the decision; but such a practice allows the acquisition of an absolute right to the land by the first applicant, and thus, in effect, disposes of the land before no-tice of the decision, in flagrant violation of the rule. The review of the rules and decisions of the land department in which we have in-dulged conclusively demonstrates the facts that on February 23, 1889, when Hartmann filed his application, there was, and there had been for 14 years prior to that time, a printed rule of the department to the effect that, after the reports of the register and receiver upon a contest over an entry had been forwarded to the commissioner, those officers should take no further action affecting the disposal of the land until instructed by the commissioner; that the practice of the depart-ment had conformed to the rule; that there had been no decision of the department which, after consideration or discussion of the rule, had modified it or limited its effect; that the few opinions cited against it do not mention or refer to the rule, and are either devoted to the determination of other questions or to a repetition of the obiter dictum in the Reed Case. In this state of the case, what was the true construction and legal effect of this rule on February 23, 1889? Even if the opinions cited against it had decided that the rule was abrogat-ed or limited, they would have been nothing more than erroneous judgments. They could not have affected the rule. Their only ef-fect would have been to have caused the issue of the patents to the particular tracts of land whose title was in question in them to the wrong party. Nothing short of an express and formal repeal or ab-rogation of the rule and public notice thereof by the secretary, who alone had the power to establish and overthrow rules, could have de-stroyed its force or limited its terms. Rev. St. §§ 453, 2478. All the authorities were that this rule, and a practice in conformity with it, obtained during the pendency of a contest, and all that discussed the question were that it continued in force until the decision of the sec-retary or commissioner was officially communicated to the local land officers. Crystal v. Dahl, Copp, Pub. Land Laws (1869–1875) 316; Eno v. McDonald, Id. 317; Jayne v. Gowdy, 7 Copp, Landowners, p. 137; Pomeroy v. Wright, 2 Land Dec. Dep. Int. 164; Perkins v. Rob-son, 6 Land Dec. Dep. Int. 828. It may well be for obvious reasons that a failure of the local land officers after receipt of the decision to perform the clerical act of canceling the prior entry on their plats and records promptly in the ordinary course of business would not con-tinue the withdrawal of the land from acquisition or entry, but this question is not presented in the case before us. The evil which the rule was made to remedy, the reason for its adoption, the terms of the rule itself have the same application to the time between the decision of a contest by the commissioner or by the secretary and the receipt of notice of the opinion by the local officers that they do to any of the time during the pendency of the contest. The rule contains no excep-tion of this interim, but broadly covers it with the prohibition that

107 F.—39

"the local officers will thereafter take no further action affecting the disposal of the land in contest until instructed by the commissioner." The conclusion is irresistible that there was a rule and practice of the land department on February 23, 1889, that land involved in contest over a prior entry before the commissioner or secretary remained withdrawn from entry and from acquisition until the decision of the secretary or of the commissioner was officially made known to the local land officers, and the notation of the cancellation of the former entry was made in the ordinary course of business on the plats and records of the local land office. Hartmann had the right to rely upon this rule and practice, and to secure this land in accordance with it; and the allowance by the secretary, in flagrant violation of it, of James' entry upon an application made before the decision canceling the prior entry was officially communicated to the local land officers, was a clear error of law.

The appellee relied upon the record of the decision of the secretary of December 21, 1894, to establish the fact that Hartmann was the first applicant to enter the land on February 23, 1889. The court below held that the secretary so found, that his finding estopped the appellants from again litigating that question, and with that view it disregarded evidence outside of that record which the appellants offered to prove that Wheeler was the first and Hartmann was the second applicant on that morning. These rulings are challenged as error, and, while counsel for appellants concede that the secretary did find in his decision of December 21, 1894, that Hartmann was the first and Wheeler was the second applicant to enter the land on February 23, 1889, they insist that his finding did not render that issue res adjudicata between the appellants and Hartmann, and did not estop them from again litigating that question, (1) because that finding was not made in litigation concerning the land here in issue; (2) because James was not a party to that issue, and that question was not material to the decision of the contest between him and Hartmann; (3) because the appellants now claim under a new and independent title, —the entry of Craig; and (4) because the appellants are neither parties nor in privity with the parties to the litigation before the commissioner, but are bona fide purchasers without notice of that litigation or of the equitable title of Hartmann. The first questions presented by these positions are, what were the issues determined by the secretary in the contest over this land which resulted in his decision in 1894, who were the parties to those issues, and what did the secretary decide? In an action which results in a judgment in a court, the pleadings, orders, opinions, and judgment may be examined to discover the true answer to these questions, and in this contest before the land department the official reports of the registers and receivers thereon, the notices of appeals, the decisions of the commissioner and of the secretary, the entire record of the proceeding exclusive of the testimony, constitute competent evidence from which to ascertain what issues were raised, litigated, and decided in the contest. By the official reports of the registers and receivers made pursuant to rules 67 and 68 of the department, by the notices of appeal, and by the decisions of the commissioner and of the secretary in that

proceeding these facts are established: On the morning of February 23, 1889, Hartmann applied in writing to enter the 40 acres here in question, hereafter called the "Hartmann 40," with Porterfield scrip, and he also applied to enter the S. E. ¼ of the N. W. ¼ of section 30, township 63 N., of range 11 W., hereafter called the "Wheeler 40," with Valentine scrip. His applications and his scrip for these two tracts were together in one envelope, and in this condition he handed them to one of the local land officers, and his envelope was immediately marked "No. 1" by one of these officers. On the same morning Warren N. Draper, an attorney at law, presented the applications of Charles P. Wheeler to enter these two tracts of land with Porterfield scrip and Valentine scrip, respectively. These two pieces of scrip and the two applications were in one envelope, which Draper handed to one of the local officers, and one of these officers marked this envelope "No. 2." In this way the question who was the first applicant for the two tracts became an indivisible issue, a contest for priority between the two envelopes, which could not by any possibility result in a finding that Hartmann was the first applicant for one and Wheeler for the other tract, and so this issue remained to the end. James had not applied to enter the Wheeler 40, but, as we have already seen, he had made an application for the Hartmann 40 on February 19, 1889, and on February 23, 1889, he again applied to enter the same land upon his application of February 19th, and because that application had remained in the hands of the officers from that date until after Hartmann made his application. The register and receiver found that Hartmann's envelope, containing his applications and scrip for the two 40's, was the first to come to their hands, awarded the two tracts to him, entered them in his name on their plats and records, and reported their findings and conclusion to the commissioner. James appealed from their decision allowing Hartmann to enter the Hartmann 40. Wheeler appealed from their decision allowing Hartmann to enter both 40's. The commissioner ordered the appeals regarding the two tracts to be consolidated in one contest, and directed a single hearing on all the issues presented by all the claimants, in which Hartmann should be the defendant and all the other claimants should be the plaintiffs. This hearing was had. The register and receiver reported. Appeals were taken from their decision to the commissioner, and from his judgment to the secretary, and the latter finally decided on December 21, 1894, that Hartmann's set of applications was first presented to and received by the local officers, and gave him the Wheeler 40, but awarded the Hartmann 40 to James on the ground that the latter's application on February 19, 1889, gave him the superior right to it. In preparing his opinion the secretary first wrote his views concerning the right secured by James through his earlier application, held that James was entitled to the Hartmann 40, and remarked that "the conclusion reached obviates the necessity of considering any of the claims initiated on February 23, 1889, to the tracts herein awarded to Alden and James, and leaves for further examination the claims of Hartmann, Wheeler, and Lawrence initiated February 23, 1889, to the S. E. ¼ of the N. W. ¼ of said section 30," and then wrote his finding

that the envelope containing Hartmann's applications was the first to reach the local land officers on February 23, 1889, and awarded the Wheeler 40 to Hartmann on that ground.

Counsel for appellants persuasively argue that the issue of the priority of Hartmann over Wheeler was immaterial to the contest between James and Hartmann, and that because the secretary first expressed his view of the prior right of James in writing his decision he never decided the question whether or not Hartmann was the first applicant on February 23, 1889, in that contest. But when the register and receiver allowed Hartmann's entry of both 40's, and made the finding, which all the subsequent decisions confirmed, that his applications and scrip for both 40's were handed to the local officers in one package, while those of Wheeler were handed to them in another, the issues concerning the priority of their applications for these two tracts of land were inextricably fastened together, so that a decision that one was prior in right upon either 40 was a judgment that he was so upon the other. Hence the decision of the secretary that Hartmann was the first applicant on February 23, 1889, for the Wheeler 40 was a finding that he was so for the Hartmann 40 here in issue. It was not material that the secretary's finding upon this issue of fact appeared, in his opinion, subsequent to his decision of the question of law raised by James' application. All the findings and conclusions in the decision were undoubtedly made by the secretary before he commenced to write any of them, and the order in which a judicial officer writes down his findings or conclusions in his opinion is no indication of the order in which he reached them. Was the question whether or not Hartmann was the first applicant on February 23, 1889, a material or necessary issue in his contest with James, and was the latter a party to its litigation and decision? When Hartmann had entered the two 40's under the decision of the register and receiver, James had appealed from that decision as to one, and Wheeler as to both, and the commissioner had ordered a consolidation of the contests involving the two tracts, and a single trial and hearing, in which James and Wheeler should be the plaintiffs and Hartmann the defendant. Under his appeal, James, as well as Wheeler, had the undoubted right to try the issue whether or not Hartmann was the first applicant on February 23, 1889, to prove, if he could, that another was first on that morning, and to defeat and cancel the entry of Hartmann upon that ground. James' appeal challenged Hartmann's right to enter the land, and, while it raised the question of law whether or not James' prior application was valid, it as clearly presented the issue of the priority of Hartmann's application on February 23, 1889. A finding of the latter issue against Hartmann would have been as fatal to his entry as the decision of the question of law against him. Not only this, but the question of law did not and could not arise in the contest between Hartmann and James until the secretary had first found that Hartmann was the first applicant on the morning of February 23, 1889. If he had decided that Hartmann was not first on that day, that finding would have rendered the decision of the question involving James' applica-

tion of February 19th unnecessary to determine the contest between him and Hartmann; and the fact that he did find, before he commenced to write his opinion, that Hartmann was first, and that fact alone, rendered the decision of the question of law necessary to a disposition of the contest between James and Hartmann. Our conclusion is that the issue whether or not Hartmann was the first applicant for the land in question in this suit on February 23, 1889, was tendered by James when he challenged Hartmann's entry, that that issue was material and necessary to the determination of the contest between James and Hartmann thus instituted, that it was inseparably united with the issue whether or not Hartmann was the first applicant for the Wheeler 40, and that that issue of fact was decided by the secretary in favor of Hartmann in the contest between him and James over the title to the land in question in this suit on December 21, 1894.

There is another reason why that decision renders the issue whether Hartmann or Wheeler was the first applicant for this land res adjudicata between the appellees and the appellants in this case. The record discloses these facts: Charles P. Wheeler had no beneficial title or interest in the application which he made for, or the rights which he acquired in, the 40 acres here in controversy. In making that application and in securing and holding his claim to this land he was the agent and trustee of the Chicago & Minnesota Ore Company, a corporation. That company' furnished the scrip and the lawyers to make the application and to conduct the contest in his name. Warren N. Draper was the attorney at law who made the application. In 1891 the Minnesota Iron Company, another corporation, purchased the stock of the Chicago & Minnesota Ore Company, and thereby acquired its interest in the Wheeler claim to this land. Joseph H. Chandler was, and still is, its general counsel. Warren N. Draper was its local attorney at Duluth, and they conducted the contest of Wheeler for the land here in question in behalf of this corporation from that time forth. The decision of the secretary of December 21, 1894, rendered the question of fact whether Hartmann or Wheeler was the first applicant for this land res adjudicata between Hartmann and Wheeler. It went further. It made that issue res adjudicata between Hartmann and his grantees and the Minnesota Iron Company and its agents and trustees, and made the decision of that question by the secretary competent and conclusive evidence of the fact that Hartmann was first in any subsequent litigation between these parties over the same subject-matter. One who institutes and conducts a litigation in another's name is estopped by the decision or judgment therein from again contesting the same issues with his adversary, or those in privity with him, as completely as the party in whose name he carries on the controversy. Lovejoy v. Murray, 3 Wall. 1, 18, 18 L. Ed. 129; Tootle v. Coleman (C. C. A.) 107 Fed. 41. Warren N. Draper, the local attorney, and Joseph H. Chandler, the general counsel, knew the interest of their client, the iron company, in this land, the decision of the secretary, and the right of the iron company to attack that decision in the courts, and to obtain the title to

the property in question; and they always claimed that Wheeler was in fact the first applicant on February 23, 1889. This is the claim on which the appellants now rely, and, if it is well founded, the Minnesota Iron Company was entitled to the title to this land on the Wheeler application, and its attorneys must have known it. How, then, can they, or those for whom they purchased, have any title or interest in it for themselves, or for any one but their client? Houghton E. James was one of the adversaries of this client in the litigation before the land officers. William Craig was a friend of Draper, who had no knowledge of the value of this land, and who took no part in the negotiations or transactions about to be related, except to do what Draper advised him to do. Draper purchased of James a relinquishment to the United States of his homestead claim upon the land for $6,500, and for a deed from Craig to him of one-half of the property, subject to a mining lease to Chandler for 50 years. Draper procured some Porterfield scrip with which to pay for the land. On September 23, 1895, pursuant to this agreement, James relinquished his claim. A moment or two later, Draper entered the land in the name of Craig, and paid for it with this Porterfield scrip, which he had obtained. Three days later, on September 26, 1895, Draper caused Craig to give to Chandler a mining lease of the tract for 50 years, and to make a deed of one half of it to James. On February 5, 1896, Craig conveyed his remaining half to James Belden, a young man, who was then about 23 years of age, who was sometimes found in the office of the Minnesota Iron Company in Chicago, and who was a clerk for a stockholder of that company, whose office adjoined that of the corporation. Craig testified in one place that he did not know what he obtained for this deed, and that the proceeds were taken and divided by Draper, by his direction, in settlement of business of a private nature, which he declined to disclose; but in another place he testified that the deed "was for a consideration of $12,000." Joseph H. Chandler negotiated for James Belden the purchase from James of an option to buy his remaining half of the land, and on March 15, 1898, he executed a grant of this option to Belden. On October 10, 1895, Joseph H. Chandler assigned his mining lease for $10,000 to C. W. Hillard, who had been for many years the first vice president of the Minnesota Iron Company. The same attorneys who conducted Wheeler's litigation for this land, with the exception of Draper, who is dead, are defending this suit. In 1897 the president of the Minnesota Iron Company offered to settle this litigation upon a certain basis. Thus, through the negotiations of the attorneys of the Minnesota Iron Company, the mining lease for 50 years has landed in the vice president of that company, and the title under the patent in James, the original homestead applicant, and in James Belden, the young clerk in the office of the stockholder of the iron company. There are many other facts too numerous to mention disclosed by this record, which point in the same direction, and no one can carefully read all the testimony without an abiding conviction that the real party in interest, the real defendant in this litigation, is the same corporation which conducted the contest in the name of Wheeler in the land office, and which be-

came bound by the decision therein. This conclusion seems to be rendered inevitable by the fiduciary relation which Draper, Chandler, and Hillard and the principals of Draper and Chandler, Craig and Belden, bore to the iron company. All of them but Craig must have had actual knowledge of the interest of the iron company in Wheeler's claim, and of the estoppel of the company and of James by the secretary's decision; and Craig had constructive knowledge of these facts, because the knowledge of his agent, Draper, was his knowledge. Neither Draper, nor Chandler, nor Hillard, nor Belden, nor Craig, nor any other party for whom either Draper or Chandler negotiated a purchase of an interest in this land, could lawfully buy and hold it adversely to the iron company. They all stood in such fiduciary relations to that corporation that any interest which they took necessarily became immediately charged with a trust in favor of that company, and any attempt to hold it adversely would constitute a breach both of faith and of trust. This state of facts compels a choice of two deductions,—either that the attorneys and the vice president of the iron company were faithless to their trust, and were buying for themselves, or for Craig and Belden, who were charged with their knowledge, interests adverse to their client in land which it claimed, or that all these parties, like Wheeler, took their titles and claims as trustees and agents for the corporation, and held them for its benefit. The presumptions of integrity and innocence, the common practice of large corporations to take titles to their property in the names of trusted employés, to which we cannot be blind, and the high character of the lawyers, who conducted and effected all these transactions leave no doubt which of these inferences must be adopted. It is that the appellants are mere trustees or agents for the Minnesota Iron Company, which holds the beneficial interest in and is really conducting this litigation in their names, and that the decision of the secretary that Hartmann was the first applicant for the land on February 23, 1889, renders that question res adjudicata between the latter and their cestui que trust and principal, the iron company.

Nor could the appellants escape from the estoppel of this decision if we were in error in our last deduction, and they were purchasers of the title and the lease they hold for themselves. When Hartmann filed his application and scrip for this land, he placed upon the record a notice that he claimed to be the equitable owner of it, and to charge the title to it in the government with a trust in his favor. From that time forth, if he was the first applicant on February 23, 1889, the United States held the naked legal title in trust for his exclusive benefit. When the decision of the secretary found that issue of priority in his favor, James, Wheeler, and the Minnesota Iron Company, and those claiming title under them, were thereby estopped from again litigating that issue in any suit to establish title to this land between them and Hartmann and his grantees. There have been no purchasers without notice of these facts in this case. Hillard, who was the vice president of the iron company for the last three years of its contest in the land department, must have known them; Draper and Chandler, the attorneys who

conducted that litigation, knew them; and Craig and Belden, for whom Draper and Chandler purchased all the interests they acquired, were charged with the knowledge of their agents in these purchases. Moreover, they are in fact the mere grantees of James, and, so far as the estoppel of the secretary's decision is concerned, they stand in his shoes. The contention of counsel that Craig, James, Belden, and Hillard are not bound by that decision because they no longer claim this land under the homestead application of James, but under a new and independent title initiated by the entry of Craig, has been examined. But it is impossible to wink so hard as not to see that the only foundation their claim of title has is that same homestead application of James on February 19, 1889, upon which his contest in the land department rested, and that the actual transaction between James and Craig was a transfer of James' claim to Craig, to accomplish which Draper used a relinquishment by the former and an entry by the latter as a substitute for some other method of conveyance. It may be conceded that, if James or the appellants claimed this land under a new and independent title, the decision of the secretary might not conclude them. Nay, more, it may be admitted that that decision does not estop them from litigating any additional rights and claims which they have acquired subsequent to its rendition. The relinquishment of a claim to land as a homestead by one party, and its entry with scrip by another, sounds like, and doubtless often is the initiation of, a new and independent title. But courts of equity look through documents, forms, and appearances, and determine the legal effect of acts and instruments by the actual transaction which they evidence. James entered this land as a homestead on August 6, 1895, under the decision of the secretary of December 21, 1894, that he had acquired the right to do so and the equitable title to the land on February 19, 1889. According to that decision, he held the equitable title to the land on September 23, 1895, when he had the right to transform it into a legal title, and to pay for it by a residence upon the property in accordance with the homestead laws of the United States. For $6,500 and a deed of one-half of it from Craig he relinquished his right to pay for it by residence, and Craig entered, and paid for it with scrip. When these things had been done, Craig held the same equitable title which James had owned before, plus a receipt for payment for the legal title. The only additional acquisition was the perfection of the right to the legal title by the payment, and, if that question of payment was here in issue, the decision of the secretary would not conclude it. Aside, however, from this immaterial question of payment, the actual transaction was, and its only legal effect was, a transfer of the equitable claim of James to Craig. The essential foundation of that claim before the transfer was James' application to enter on February 19, 1889, and the decision of the secretary on December 21, 1894, and the indispensable basis of that claim after the transfer and the entry of Craig was that same application and decision. Strike either down, and the claim of Craig and of his grantees is without foundation, and the equitable title of Hartmann prevails. The result is that in reality, in legal effect, Craig, James,

Hillard, and Belden are the immediate and remote grantees of James, in privity of estate with him, bound by notice of the equitable title of Hartmann and by the estoppel of the decision of the secretary that Hartmann was the first applicant to enter this land on the morning of February 23, 1889.

For the reasons which have now been stated the conclusion of this court is that in the contest before him the secretary decided on December 21, 1894, that Hartmann was the first applicant to enter this land on the 23d day of February, 1889; that that question was a material and necessary issue between Hartmann and James, and also between Hartmann and Wheeler in that contest; that this suit involves the same cause of action,—the equitable title to the same land there in question between James and Hartmann; that it is between privies in estate with the parties to that contest claiming the title in the same rights, respectively, which were there litigated; that the decision of the secretary rendered the issue of fact whether Hartmann or Wheeler was the first applicant res adjudicata between the parties to this suit, and was competent and conclusive evidence thereof in this litigation. In an action between the same parties, or those in privity with them, upon the same claim or demand, a decision upon the merits is conclusive not only as to every matter offered, but as to every admissible matter which might have been offered to sustain or defeat the claim or demand. But in a case in which the second litigation is upon a different claim or demand, the prior judgment is an estoppel as to those matters in issue or points in controversy which were actually litigated and decided, and upon which the finding or judgment was based. Cromwell v. County of Sac, 94 U. S. 351, 352, 24 L. Ed. 195; Board v. Platt, 79 Fed. 567, 571, 25 C. C. A. 87, 91, 49 U. S. App. 216, 223; Same v. Sutliff, 97 Fed. 270, 273, 274, 38 C. C. A. 167, 170.

The testimony offered by the appellants dehors the record in the contest before the secretary to show that Wheeler was the first and Hartmann the second applicant was properly disregarded by the court below, because they did not plead or offer to prove that the secretary's decision of this question of fact was induced by fraud or mistake, and, in the absence of such pleading and proof, his finding was conclusive. U. S. v. Northern Pac. R. Co., 95 Fed. 864, 870, 882, 37 C. C. A. 290, 296, 308.

Finally, it is said that the Porterfield scrip with which Hartmann applied to enter the land had been exhausted by its use to purchase other land many years before. In 1868, Charles A. Gilman was the owner of this scrip, and he applied to the register of the land office at St. Cloud, Minn., to purchase for cash a certain 40 acres of land, and delivered this scrip to the register in payment for it. The register allowed and reported the entry of the land as a cash entry, and the scrip was sent to the United States treasury in payment for it. The land so entered was not open to private purchase for cash, but was open to the location of this scrip. On the other hand, a cash entry could not be paid for with land warrants. The result was that the scrip was returned to Gilman, and the land was patented on the cash entry in 1868. About 17 years later, a deficit

was found to exist in the accounts of the receiver of the land office at St. Cloud, because he had obtained no cash for the entry upon which this patent was issued. Gilman again produced the scrip to the receiver to pay this deficit, but the government returned it to him, and he paid for the land in cash. Hartmann subsequently bought the scrip. There are two reasons why these transactions did not invalidate the land warrant in the hands of Hartmann. In the first place, Gilman never succeeded in either locating or paying for his land with the scrip, and the government returned it to him in full force, unused and uncanceled. Conceding that the land which he secured was not open to private entry for cash, yet it was land of the disposition of which the land department had jurisdiction, and in this collateral attack upon the judgment of that department, evidenced by its patent, to the effect that the land could be lawfully sold for cash, its decision is invulnerable. U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 957, 15 C. C. A. 96, 105, 32 U. S. App. 272, 286. In the second place, the United States are the only parties that can claim the ownership or cancellation of this scrip, and they are estopped from doing so by their patent of the land for cash, by their refusal to take the scrip in payment for it, and by their return of it uncanceled. This scrip was assignable, and Hartmann had the right to rely, and doubtless he did rely, upon the result of these acts of the government, upon the absence of any cancellation or marks of location upon the scrip when he purchased it, and neither the government nor strangers to these transactions can successfully attack the validity of or the title to the scrip on their account. U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 960, 15 C. C. A. 96, 108, 32 U. S. App. 272, 291.

All the questions of moment presented by counsel for the appellants in these suits have now been considered and decided; and, conceding the proposition with which they opened their argument,— that it was incumbent upon the appellee to prove by competent evidence the facts necessary to entitle it to the title to the land in question under the rules of law applicable to the case,—the conclusion of the whole matter is that it has done so, that there was no prejudicial error in the rulings or decrees of the circuit court, and that they must be affirmed. It is so ordered.